817 A.2d 381 (2003)
358 N.J. Super. 179
Barbara PEREGOY, Plaintiff-Appellant,
v.
Matthew PEREGOY, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 2002.
Decided March 11, 2003.
*383 Stacey D. Kerr argued the cause for appellant.
Matthew E. Peregoy, respondent, argued the cause pro se.
Before Judges KING, WECKER and FUENTES.
*382 The opinion of the court was delivered by WECKER, J.A.D.
This child custody case requires us to address a question left open in Hendry v. Hendry, 339 N.J.Super. 326, 336, 771 A.2d 701 (App.Div.2001). Where the parties to a New Jersey divorce proceeding agree in their Property Settlement Agreement that one parent will have primary residential custody of their child, that the custodial parent may move out-of-state with the child, and that jurisdiction over custody *384 and visitation issues will remain in New Jersey, which will be deemed the child's home state, does there come a time when that consent-to-jurisdiction is no longer effective? Putting the question another way, what is the relationship between the Uniform Child Custody Jurisdiction Act, N.J.S.A. 2A:34-28 to -52 ("UCCJA" or "the Act"), and the parties' voluntary agreement respecting jurisdiction? Because we conclude that the Family Part did not give due consideration to all the statutory factors when it exercised jurisdiction over an application to change custody, we remand for a determination whether New Jersey remains the appropriate state to exercise jurisdiction.
Given the nature of our society, it is not uncommon for divorced parents to live in different states, sometimes at great distances from each other, as in this case. See, e.g., Baures v. Lewis, 167 N.J. 91, 770 A.2d 214 (2001). Thus applications to modify custody and visitation orders, which are difficult enough when all of the parties live within a single jurisdiction, become complicated by an overlay of jurisdictional issues.
Addressing the effect and longevity of the parties' consent-to-jurisdiction agreement, we decline to impose a bright-line rule holding the agreement binding, either for a prescribed period of time or until the child's emancipation. We conclude that so long as one parent remains a New Jersey resident, as here, the other party's consent to the continuing jurisdiction of the New Jersey courts establishes the minimum basis for the court's continuing jurisdiction. However, that consent is only one factor to be weighed in the decision whether to exercise jurisdiction pursuant to the UCCJA. The parties cannot agree in advance to ignore the Act, or for the court to proceed contrary to the Act. The UCCJA recognizes that more than one state may have jurisdiction over custody and visitation and provides guidance for determining which state shall exercise its jurisdiction in furtherance of the Act's purposes. Those purposes include the avoidance of conflicting orders issued by the courts of different states, assuring that custody litigation takes place in the state with the "closest connection" with the child and the most "significant evidence," and most importantly, where the best interest of the child can be served. The Act aims to limit controversy in the interest of protecting a stable home environment and secure family relationships. N.J.S.A. 2A:34-29.[1] *385 A second issue dramatized by this case is the necessity for plenary proceedings and detailed findings by a Family Part judge before ordering a change in custody. We conclude that the Family Part judge clearly erred in summarily changing primary physical custody of this eight-year-old child from his mother, with whom he had been living in Oklahoma for the last seven of his eight years, to his father in New Jersey. Were it not for the passage of time since the August 2001 order enjoining this child's return to his mother in Oklahoma, at the end of his regular, eight-week summer visit in New Jersey, we would order an immediate return to the status quo ante. Because the child has now been living with his father in New Jersey since the summer of 2001, we remand instead for further proceedings, as we shall explain.
Certain facts and procedural history are undisputed. The parties were married and divorced twice. Their son Kevin, born November 20, 1992, is the only child of their second marriage to each other.[2] Their second judgment of divorce, entered in 1993 when Kevin was just one year old, incorporated a property settlement agreement ("the agreement").[3] Under that agreement, the parties were to share "joint legal custody" of Kevin, with plaintiff to have "primary residential custody" for the first twelve months, "pending an evaluation by the court...." Plaintiff was permitted to move with Kevin to Oklahoma, where she had been raised and where her parents still lived.[4] Apparently in consideration of defendant's consent to Kevin's move to Oklahoma, plaintiff agreed to a list of conditions, including:
a. The State of New Jersey shall retain jurisdiction over the minor, KEVIN PEREGOY, and shall constitute the "home" state in accord with the Uniform Child Custody and Jurisdiction Act as adopted by the State of New Jersey;
b. Within a period of one (1) year, the Court shall review the nature of the joint custodial relationship between the parties, anticipatory changes in the child, consistent with such variables as age, academic and vocational settings and differences; the nature of the home component; together with an examination of the success or lack thereof of the custodial access arrangement; including, but not limited to, addressing the problems, if any, in the compliance by BARBARA PEREGOY of the custodial access....
Among the detailed provisions of the agreement relating to custody and visitation, Kevin was to spend a minimum of twelve weeks each year with defendant, Matthew Peregoy, including a block of eight weeks during each summer, up to two weeks each at winter and spring breaks, and at other mutually agreed upon times.
*386 The agreement also contemplated that if plaintiff were to find herself "unable to economically and physically care" for Kevin, the parties could "discuss a change of Kevin's primary residential custody" and enter into a written agreement with respect to such a change without "application to a court of competent jurisdiction for a change of custody." The agreement repeated that in any event, the Family Part of the New Jersey Superior Court "shall review the custodial arrangement within a period of one (1) year." No such review took place, and neither party invoked the one-year review or initiated any other court action until defendant's application by Order to Show Cause near the end of Kevin's summer stay in New Jersey in August 2001.
With respect to child support, the agreement provided that defendant was to pay fifty-five dollars per week to plaintiff, to be suspended during the eight weeks Kevin spent with defendant each summer. Defendant was also to be responsible for all of the travel expenses associated with his visits to Kevin in Oklahoma and Kevin's stays in New Jersey, up to $1,875 per year, with a potential adjustment to child support in the event travel expenses exceeded that amount in any year.
Immediately after the divorce, plaintiff, Barbara Peregoy, moved to Oklahoma with Kevin, where she has remained and where Kevin remained a resident until the summer of 2001. In Oklahoma, Kevin lived with plaintiff and his half-brother, the child of his mother's first marriage, who was twenty years old in 2001. Kevin's maternal grandparents lived across the street. Plaintiff was employed as a nurse in a local hospital.
After plaintiff's relocation to Oklahoma, Kevin returned to New Jersey to spend eight weeks each summer with his father; he also spent vacations at Christmas and Easter with his father in New Jersey. Defendant operated a financial consulting business out of his home. In 2001, Kevin spent the summer with his father as usual. Kevin was then eight-and-one-half years old, and he was due back in Oklahoma on August 17 to begin school.
On August 6, 2001, defendant obtained an ex parte Order to Show Cause in the Family Part, temporarily enjoining Kevin's return to his mother in Oklahoma and temporarily ordering sole custody of Kevin to defendant. In support of his application for the order to show cause, defendant submitted a letter from a psychologist, Dr. Monty N. Weinstein,[5] as well as his own certification. Dr. Weinstein described having consulted with defendant "for over ten hours" and having observed defendant with Kevin "for several hours." He restated defendant's version of Kevin's experiences both with plaintiff and with defendant; reported that Kevin had expressed to him "that he wishes to remain in New Jersey with his father and yet still see his mother"; described defendant in highly complimentary terms; and concluded that defendant "has all the qualities to assume custody," and that "it is in the best interest of Kevin Peregoy to have an ongoing relationship with his father which is not happening now due to the fact that the mother is living in Oklahoma." The order referred to the possibility of irreparable harm or damage to Kevin if he was returned to his mother's care.[6]
*387 The order was premised expressly upon defendant's certification alleging that Kevin was afraid to return to his mother in Oklahoma, that Kevin had expressed feelings of anxiety about his mother's likely retribution for his wanting to stay with his father, and that plaintiff failed to take Kevin to a dentist or an eye exam, as well as a finding, before plaintiff had an opportunity to respond, that her "ability to continue emotional and psychological abuse [if Kevin is returned to her] combined with a generally combative nature is grounds for Kevin's fear."
The order required plaintiff to show cause on August 13, 2001 why its terms should not be continued pending a custody investigation. In her certification in response, opposing jurisdiction in New Jersey and opposing any change in custody, plaintiff denied all of defendant's allegations and described Kevin's life with her and with his brother and grandparents in Oklahoma. She described his success in school and involvement in soccer, as well as his medical care. In response to defendant's certification alleging that her older son was a bad influence because he wanted to be a spy, plaintiff explained that he hoped to join the FBI or CIA. At argument on August 13, 2001, plaintiff was represented by counsel.
Defendant appeared pro se, but was accompanied by an individual who identified himself as James Wilks, "an advocate with the National Association of Fathers." That individual was not permitted to remain at counsel table with defendant. The Family Part judge referred to an interview with Kevin by Eve Holt, a social worker with the Ocean County Probation Department. The judge provided defendant and plaintiff's counsel with a one-page "Inter-Office Note" he received from Ms. Holt, dated August 9, 2001. In that note Ms. Holt reported that she had interviewed Kevin and recommended "the child remain here in New Jersey pending the completion of the investigation."[7]
Plaintiff's counsel argued on August 13 that "[t]he most logical reading" of the parties' consent-to-jurisdiction clause is that it was intended to allow the parties to return to court in New Jersey for the one-year review of the custody arrangement, as provided under the property settlement agreement. Counsel argued that the parties had waived that review, and therefore the consent-to-jurisdiction no longer applied. He argued that Oklahoma was now the child's home state, and as the jurisdiction with more contacts and information relevant to a custody determination, Oklahoma was also the more convenient and appropriate forum, citing Ivaldi v. Ivaldi, 147 N.J. 190, 685 A.2d 1319 (1996). Counsel also argued that there were no grounds for interfering with Kevin's return to his mother in Oklahoma as scheduled, in time for the first day of school on Friday, August 17. The judge rejected those arguments, continued temporary restraints upon Kevin's return to Oklahoma, and reserved further decision until the following Monday, August 20, 2001.
After further argument on August 20, the judge made this determination:
THE COURT: I find that New Jersey has jurisdiction. I find that the child was born here, this was a bargained-for *388 aspect as part of Mrs. Peregoy leaving for Oklahoma and this Court has jurisdiction of the matter.

I admit that it might not be very convenient to be holding this evaluation here but it certainly is something that, apparently, Mr. Peregoy bargained for and should have. So we're going to continue the examination for child custody.
[Emphasis added.]
The judge continued the restraints upon Kevin's return to his mother in Oklahoma pending completion of a full custody investigation, to be undertaken by the county probation department in New Jersey. The judge also imposed, sua sponte, visitation for plaintiff in New Jersey only, to be supervised by defendant's mother, who lived in Virginia.
On August 30, 2001, plaintiff's application for emergent relief and for leave to appeal the August 20 order were denied by this court.
On August 17, while the Order to Show Cause was pending, defendant filed a motion for retroactive relief on his child support obligation and related tax issues. On September 27, 2001, plaintiff filed a cross-motion in the Family Part to set aside the existing orders, to return custody to her, in the alternative to allow Kevin to return to Oklahoma for holiday visits, and for related relief. For reasons we cannot determine from the record, those motions were heard before a different Family Part judge. On October 5, 2001, the second judge denied plaintiff's motions, including her request for an in camera interview with Kevin.
On November 9, 2001, defendant filed a motion to establish his right to child support from plaintiff in the amount of eighty-five dollars per week, to compel plaintiff to provide life and health insurance for the benefit of Kevin, and to relieve defendant of further child support obligations to plaintiff. By cross-motion, plaintiff sought relief on various financial and visitation issues.
Oral argument on those motions was heard on January 11, 2002 by the second judge.[8] The judge declined to consider a Home Study completed by the Oklahoma Department of Human Services, telling plaintiff's counsel "I understand that you submitted late a copy of an Oklahoma review." Without the full custody investigation promised on August 20, 2001 by the judge who entered the order to show cause,[9] without an evidentiary hearing respecting defendant's application to change custody, and without findings respecting the best interests of the child, the judge ordered sole custody to remain in defendant. The order provided for reasonable and frequent visitation for plaintiff on one month's written notice. The parties were ordered to share equally the costs of visitation, including travel expenses, and plaintiff was ordered to pay ninety-one dollars per week in child support. At least as of the filing of briefs on this appeal, Kevin apparently had not been back to Oklahoma. The record does not reveal the nature or extent of his visitation with plaintiff since August 2001.
*389 Restating plaintiff's arguments on appeal, she contends through counsel that (1) the consent-to-jurisdiction provision of the agreement is void; (2) Oklahoma is the state with jurisdiction and the more appropriate forum; (3) defendant's initial application for emergent relief did not set forth a prima facie case of changed circumstances to warrant the Family Part in entertaining further proceedings to change custody; (4) the court erred in granting injunctive relief barring Kevin's return to his mother's custody and to his home with her in Oklahoma; (5) the court erred in considering the reports of Dr. Weinstein and Ms. Holt without hearing their testimony and thus without giving plaintiff the opportunity to cross-examine each of them; (6) the decision to change custody of Kevin permanently to defendant without a plenary hearing, without interviewing Kevin, and without making any findings of fact to support that decision was arbitrary and capricious; and (7) the determination of child support due from plaintiff to defendant in light of the change in custody, but without adherence to the Child Support Guidelines, was error.
Defendant, who is representing himself on this appeal, essentially argues that the orders appealed from should be affirmed. The legal argument in his brief consists of criticizing plaintiff's procedural history and restating and elaborating upon the allegations contained in his certifications filed in the Family Part.[10]
Plaintiff's contention that the agreement is void with respect to jurisdiction is without merit and does not warrant extended discussion in this opinion. See R. 2:11-3(e)(1)(E). Suffice it to say that plaintiff does not allege that defendant engaged in any impropriety in obtaining her consent to that agreement. See Hendry v. Hendry, 339 N.J.Super. at 334, 771 A.2d 701. Nevertheless, the scope of that agreement is open to question, as reflected in plaintiff's argument on the Order to Show Cause. We will address plaintiff's remaining contentions.

I

A
The language of the agreement itself supports plaintiff's contention that the parties did not agree that New Jersey would retain jurisdiction for all time. First, the agreement provided that New Jersey "shall retain jurisdiction and shall constitute the `home' state in accordance with the Uniform Child Custody Jurisdiction Act...." (Emphasis added). The agreement thus expressly incorporates the Act's definition of "home state" and implies an intention for the court to act "in accordance with" the UCCJA. Under the UCCJA as enacted in New Jersey, the home state is the state where the child has lived "for at least six consecutive months" proceeding the action. Unquestionably, Oklahoma was Kevin's home state in August 2001.
Second, in providing for the possibility that the parties might agree to a change in the custodial agreement in the future, and in further providing that they could do so by "a written letter executed by both," their agreement said: "[I]t is not necessary for an application [to be made] to a court of competent jurisdiction for a *390 change of custody[.]" Reference to "a court of competent jurisdiction," and not simply to the Superior Court of New Jersey, suggests that the parties contemplated another court having jurisdiction in the future, and that their 1993 consent to jurisdiction was intended to apply only to the one-year review. The first judge rejected that argument out of hand. Plaintiff's interpretation, if not controlling on its face, at least evidenced an ambiguity that should have prompted further consideration and perhaps an evidentiary hearing before defendant's interpretation was adopted and before the court held that the agreement controlled.

B
A forum selection or consent-to-jurisdiction clause respecting custody and visitation can be effective. See, e.g., Hendry, 339 N.J.Super. 326, 771 A.2d 701, Bless v. Bless, 318 N.J.Super. 90, 723 A.2d 67 (App.Div.1998); G.C. v. M.Y., 278 N.J.Super. 363, 367, 370, 651 A.2d 110 (App.Div.1995). See also Ivaldi v. Ivaldi, 147 N.J. 190, 685 A.2d 1319 (1996). To say that the agreement can be effective, however, is not to say that it is effective for all time or that it controls if it is inconsistent with the UCCJA.
These are the facts in Hendry. The child had lived in New Jersey with both his parents until their separation, and in total until he was almost seven years old. In a property settlement agreement incident to their divorce, the parents agreed that the mother could move with the child to North Carolina, and New Jersey would "irrevocably" retain jurisdiction over all issues relating to their child. The father subsequently moved to New York. He also had a second home in North Carolina, not far from where the mother and child were living. When the mother initiated a court proceeding in North Carolina to modify visitation, the father brought a motion in New Jersey to enforce litigant's rights and to change primary residential custody to him. The North Carolina judge conferred with the Family Part judge in New Jersey, consistent with the UCCJA. N.J.S.A. 2A:34-35(d).
Upon learning of the consent-to-jurisdiction agreement, the North Carolina judge declined jurisdiction. In affirming the New Jersey Family Part judge's decision to exercise jurisdiction, we said that after taking into account the circumstances and language of the parties' agreement, "New Jersey becomes a more appropriate forum than North Carolina, at this time." 339 N.J.Super. at 334, 771 A.2d 701 (emphasis added). We noted that the child had only lived outside New Jersey for approximately three years, and we said: "[w]e specifically do not rule on the longevity of the `irrevocability' of the consent-to-jurisdiction agreement." Id. at 336, 771 A.2d 701.
In Bless, the parties modified their New Jersey divorce judgment with a consent order changing their child's primary residential custody to the father, who had relocated to Switzerland. The consent order provided that "custody and visitation shall remain subject to the jurisdiction of New Jersey." 318 N.J.Super. at 95, 723 A.2d 67. A dispute arose over the mother's several requests that the father return the child to her in New Jersey. The Family Part judge initially issued orders extending the child's summer visitation with his mother, but later concluded that New Jersey no longer had jurisdiction, and that Switzerland had obtained exclusive jurisdiction because Switzerland had become the child's home state under the Hague Convention. We reversed, holding that as the child's original home state, New Jersey retained jurisdiction both under the UCCJA's "significant connection" test, N.J.S.A. 2A:34-31(a)(2), and because the *391 consent-to-jurisdiction clause of the parties' agreement was enforceable. At the time, the child had lived in Switzerland with his father for less than one full school year, and the mother resisted returning him to Switzerland during his summer visitation in New Jersey.
In G.C., the consent-to-jurisdiction provision in a post-judgment custody agreement was one of several alternate grounds we cited for affirming a decision that New Jersey retained jurisdiction, despite the fact that the children by that time had lived for one year with their father in New York.
In Ivaldi, the parties' separation agreement contemplated the mother's move to Morocco with the child while the father remained in New Jersey, the family's home for several years. The agreement provided for New Jersey law to apply to any future dispute; it did not include a choice of forum. The mother initiated a divorce and custody proceeding in Morocco within three months of moving there with the child. The father immediately filed an action in New Jersey, and each parent contested jurisdiction in the other forum.
In reviewing this court's decision deferring jurisdiction to Morocco on grounds of international comity without deciding whether New Jersey had jurisdiction, the Supreme Court held that the UCCJA applied to an international as well as an interstate custody dispute, and that both New Jersey and Morocco had subject matter jurisdiction. Ivaldi, 147 N.J. at 202 204, 685 A.2d 1319. The Court remanded the matter to the Family Part "to determine whether Morocco or New Jersey provides the more convenient forum." Id. at 204, 685 A.2d 1319. The Court cited N.J.S.A. 2A:34-35(c), the provision of the UCCJA which provides that a court should "consider if it is in the interests of the child that another state assume jurisdiction." Id. at 205, 685 A.2d 1319. The Court's finding of concurrent jurisdiction in Ivaldi informs our decision here.
The theme we discern from these cases, and apply now, is that a three-step analysis is required when jurisdiction over custody or visitation, or the exercise of such jurisdiction, is disputed in a New Jersey court in the face of a prior agreement consenting to jurisdiction. The first step is to determine whether a valid (that is, a knowingly bargained-for and agreed-upon) consent-to-jurisdiction clause is part of the parties' agreement respecting custody and visitation. See Hendry, 339 N.J.Super. at 334, 771 A.2d 701. The second step is to determine whether any other state has acquired subject matter jurisdiction pursuant to the UCCJA or other applicable law, such as the Parental Kidnapping Prevention Act, 28 U.S.C.A. § 1738A (PKPA).[11] The existence of an agreement to continuing jurisdiction in New Jersey does not preclude acquisition of concurrent jurisdiction in another state, consistent with the UCCJA. See N.J.S.A. 2A:34-35.
Finally, in the event that the court finds concurrent jurisdiction in two states, the third step is to determine which is the more appropriate state to exercise *392 its jurisdiction in the child's best interest. We now hold that in determining which of two potential forum states should exercise jurisdiction, the parties' agreement is not necessarily controlling; rather, it is one of several factors to be considered within the framework of the UCCJA. See N.J.S.A. 2A:34-35(c)(4), listing as a factor in determining which state is the more convenient forum, "[i]f the parties have agreed on another forum which is no less appropriate." The weight to be given to the parties' consent to jurisdiction depends upon a number of factors, including the time elapsed since the child left the state, the strength of the child's connections to this state compared to another state, and the place where the most evidence relevant to the child's best interest, including witnesses, is available. See Ivaldi, 147 N.J. at 204-05, 685 A.2d 1319. The choice of forum requires the court to consider "if it is in the interest of the child that another state assume jurisdiction." N.J.S.A. 2A:34-35(c).
Returning to a consideration of the scope of our decision in Hendry, we note that this case arises in a somewhat different procedural posture. Whether or not the North Carolina judge in Hendry should have deferred the exercise of jurisdiction to New Jersey, that deferral alone established good reason for a New Jersey court to honor the parties' agreement and to exercise jurisdiction. In this case, there was no court action pending in Oklahoma when defendant sought an Order to Show Cause in a New Jersey court. Had there been a decision by an Oklahoma court to defer to New Jersey's jurisdiction, such as that of the North Carolina judge in Hendry, or a conference with an Oklahoma judge who expressed an intention to decline jurisdiction, that circumstance would have been entitled to great weight. Obviously, a pending action in another state warrants consultation between the two courts. N.J.S.A. 2A:34-35d. Nonetheless, the lack of a pending action in the other state hardly signified that New Jersey must or should exercise jurisdiction.
Furthermore, we see nothing in the record or the law to suggest that Oklahoma law or procedure in regard to custody matters is inconsistent with the principles of New Jersey law. Oklahoma's enactment of the UCCJA, formerly 43 Okla. Stat. Ann. § 501-527, was repealed and replaced by enactment of the Uniform Child Custody Jurisdiction and Enforcement Act, 43 Okla. Stat. Ann. § 551-101 to -402, effective November 1, 1998 ("UCCJEA"). See also 9 Uniform Laws Annotated 657 (1999) ("ULA"); Ivaldi, 147 N.J. 190, 202-03, 685 A.2d 1319.[12] Oklahoma adopted the UCCJEA effective November 1, 1998, to replace the UCCJA. The significant difference potentially applicable to this case is that the UCCJEA, consistent with the PKPA, grants "continuing jurisdiction" to the state where an initial custody order has been entered, until the child no longer has "a significant connection" and "substantial evidence is no longer available" in the original state, or when neither the child nor a parent resides in that state. It appears that an Oklahoma court would find that it has jurisdiction to modify 1993 New Jersey custody order only if New Jersey finds either that it no longer has continuing jurisdiction or that Oklahoma would be a more convenient forum to hear an application to modify *393 custody or visitation. 43 Okla. Stat. Ann. § 551-203.1 Oklahoma's enactment of the UCCJEA includes a provision for "temporary emergency jurisdiction" where a child is deemed to require emergent protection. 43 Okla. Stat. Ann. § 551-207. Where the potential jurisdiction of two states is involved, the courts are to confer, on the record, and may give the parties an opportunity to participate in that conference. 43 Okla. Stat. Ann. § 551-110.
In fact, when Eve Holt wrote to the Oklahoma Department of Human Services on November 19, 2001,[13] seeking its assistance in obtaining a home study and custody evaluation, a detailed report was forthcoming within six weeks. The State of Oklahoma Parent Home Study apparently was completed on December 31, 2001. That is the report the second judge refused to consider. It reflects interviews and a home visit with Barbara Peregoy and with Kevin's then twenty-year-old half-brother, Christopher Hall. The study also reflects an appropriate home and parenting situation with Mrs. Peregoy in Lawton, Oklahoma.[14]
Although we have not undertaken an exhaustive study of the other forty-nine states, our research has revealed decisions in four states, Illinois, Georgia, Maryland, and Missouri, that address the effect of a consent-to-jurisdiction provision in light of the UCCJA, on facts similar to those before us. One court finds the agreement controlling; one finds the agreement null and void; a third finds the agreement "not controlling;" and the fourth decides the case under the UCCJA without reference to the agreement. To the extent that there is a unifying element in those cases, it is that all four state courts purport to act in accordance with the UCCJA.
In In re Marriage of Hilliard, 178 Ill. App.3d 620, 127 Ill.Dec. 671, 533 N.E.2d 543 (1989), the mother and children had lived in California by agreement for two years. The Illinois court enforced the parties' Illinois settlement agreement, which provided that post-judgment proceedings would be filed only in Illinois, and affirmed denial of the mother's motion to transfer jurisdiction to California on grounds of an inconvenient forum. In the alternative, the court concluded that the trial court had discretion to exercise its "continuing" jurisdiction pursuant to the UCCJA, irrespective of the agreement. Id. at 545-46. But see In re Marriage of Bueche, 193 Ill. App.3d 594, 140 Ill.Dec. 566, 550 N.E.2d 48 (1990), holding that the UCCJA did not require Illinois to defer the exercise of jurisdiction to Michigan, despite a Michigan decree providing for Michigan to retain jurisdiction. The court remanded to determine whether the child had lived in Illinois for six months, in which case a determination of the more convenient forum would be required.
*394 In Gouse v. Wilson, 207 Ga.App. 574, 428 S.E.2d 571 (1993), aff'd, 263 Ga. 887, 441 S.E.2d 57 (1994), the Georgia appeals court refused to enforce a provision of an Ohio divorce judgment, in which the parties stipulated that
[Ohio] shall always retain exclusive continuing jurisdiction over the minor children.... [and that] Ohio shall ... always remain the home state ... and neither party shall attempt to initiate any actions under the UCCJA ... notwithstanding [the children's residence in] Georgia or any other jurisdiction.
When the mother sought to modify the custody and visitation provisions of the Ohio decree in Georgia, after having lived in Georgia for several years, the father obtained an order in Ohio declaring the mother in contempt for filing the Georgia action.
The Georgia trial court dismissed the mother's action, and the appellate court reversed, holding that "[s]uch provision is a nullity even though it is based on the agreement of the parties." Id. at 573. The court reasoned that "a decree which attempts to retain jurisdiction of custody matters contravenes the letter and the spirit of the UCCJA" and held that jurisdiction to modify a child custody order would be determined solely under the UCCJA. Ibid.
A Maryland intermediate appellate court likewise refused to enforce a consent-to-jurisdiction and forum selection agreement, concluding that under the UCCJA, Maryland had jurisdiction to modify a Rhode Island custody order because Maryland had become the home state of the children. Olson v. Olson, 64 Md.App. 154, 494 A.2d 737 (1985). In Olson, the parties were divorced in Rhode Island in 1979, and the children moved with their father to Maryland. When the mother refused to return the children after visitation in the summer of 1984, the father brought an action in Maryland to modify the Rhode Island decree. The trial court dismissed for lack of jurisdiction, based on the parties' divorce agreement.
The Maryland appellate court reversed, holding that the agreement "that Rhode Island `shall continue to retain jurisdiction' is not controlling." Id. at 739. The court held that the issue "is governed by Maryland's UCCJA," that Rhode Island had lost jurisdiction because the children no longer had significant connection with that state, that Maryland had become the children's home state under the UCCJA, and that the home state "[a]s a general rule should be the jurisdiction to hear and determine custody issues" unless precluded by some other provision of the UCCJA.
In Love v. Love, 75 S.W.3d 747 (Mo.Ct. App.2002), the parties' 1996 post-judgment "Parenting Agreement" provided for the child to live most of the next two years in Missouri with his father and most of the following two years in Florida with his mother. When the parties could not agree on a continuing arrangement in 2000, each filed an application in a Missouri court. The mother sought "transfer" to a Florida court. The trial court found that Missouri remained the child's home-state under the UCCJA because the parties had contemplated his stay in Florida to be temporary. The appellate court affirmed. Neither court invoked the "Forum Selection Clause" of the Agreement as the basis for finding jurisdiction in Missouri.

C
In this case, we find that the Family Part judges who addressed the dispute over Kevin's custody mistakenly exercised their discretion by failing to consider that Kevin's home state in August 2001 under the UCCJA was Oklahoma.
*395 N.J.S.A. 2A:34-30e. Thus under New Jersey law, Oklahoma had jurisdiction to modify the New Jersey custody order. N.J.S.A. 2A:34-31a(1). Arguably, New Jersey also had jurisdiction under N.J.S.A. 2A:34-31a(2), and the New Jersey court therefore was required to decide whether it was an inconvenient forum. N.J.S.A. 2A:34-35. It would have been appropriate for a New Jersey judge to contact an Oklahoma family court judge with the aim of conferring, in accordance with N.J.S.A. 2A:34-35(d) and 43 Okla. Stat. Ann. § 551-110, to determine which state should exercise jurisdiction. Compare, e.g., D.B. v. R.B., 279 N.J.Super. 405, 408, 652 A.2d 1254 (App.Div.1995) (where the New Jersey trial judge conferred with the Virginia judge before whom custody proceedings were pending, we found no abuse of discretion in the decision to defer to Virginia's jurisdiction). The record strongly suggests, although we do not decide, that when this matter first arose in August 2001, Oklahoma had the more significant, more recent, and more substantial connections with Kevin than did New Jersey. Those circumstances should have been considered along with the parties' seven-year-old consent-to-jurisdiction agreement before a New Jersey court determined to proceed on the merits. As we have previously recognized:
[T]he rationale for the Legislature's adoption of the UCCJA appears in Ivaldi,... holding that the Act applies to an international child custody dispute and remanding that case to the trial court to determine whether New Jersey or Morocco provides a more appropriate forum. In so ruling, the Supreme Court described "the central policy of the Act's jurisdictional provisions ... to assure that custody litigation occurs in the place where the child and his or her family have the closest connection."
[Ganz v. Rust, 299 N.J.Super. 324, 335, 690 A.2d 1113 (App.Div.1997) (quoting Ivaldi 147 N.J. at 198, 685 A.2d 1319.)]

II
We now address the substantive decisions under review: first, the decision to enjoin Kevin's return to his mother in August 2001, and second, the decision to change primary physical custody to his father in January 2002.
When one parent seeks emergent relief on the ground that the child will be endangered by return to the custody of the other parent, whether in or outside the state, the court finds itself on the proverbial horns of a dilemma, a dilemma which requires the most thoughtful exercise of discretion. On one hand, the court must be mindful of the possibility of exaggeration (not to say bad faith) on the part of the petitioner. On the other hand, the court's first priority must be to protect the child. In addition, the court must keep in mind that a temporary decision to change custody can take on a life of its own, creating a new status quo. Nominally temporary orders involving the custody of a child have a tendency to become permanent, first de facto and then de jure, because a child's interest in stability can be difficult to balance against a parent's legal rights. The child's "home-state" by law changes after six months, and new connections and evidence develop. The overriding fact is that the child's life goes on. He is not property to be handed back and forth each time an order is sought or appealed. Because the judge's immediate decision in response to an application for emergent relief is necessarily discretionary, we exercise great restraint in interfering, as long as there is a rational basis in the record for the relief granted.
We conclude that defendant's initial showing, as indicated on its face by the *396 first judge's order, did not establish sufficient grounds for an immediate though nominally temporary change in custody, enjoining his return to his mother, his home, and his school. Concerns that "may" lead to irreparable harm are not enough. See Crowe v. De Gioia, 90 N.J. 126, 132-34, 447 A.2d 173 (1982). This was especially so where plaintiff had a seven-year history of compliance with the parties' agreement by sending the child to New Jersey each summer and at Christmas and Easter holiday weeks, and where plaintiff was subject to the enforcement jurisdiction of another state's court operating under laws consistent with the UCCJA.
Under the standard required to establish the right to injunctive relief as set forth in Crowe, and long applied by New Jersey courts, it was defendant's burden to demonstrate that (1) irreparable harm was likely if relief were denied, (2) the applicable law was well-settled, (3) the material facts were not substantially disputed and petitioner was likely to succeed on the merits, and (4) the hardship on plaintiff (and the child) did not outweigh the benefit to defendant (and the child). Defendant did not present any direct evidence that his contentions about plaintiff or Kevin's life with plaintiff and his half-brother in Oklahoma were true. Defendant offered little or no independent evidence of the facts concerning Kevin's life with his mother in Oklahoma, other than his own opinions and speculation. Compare Marcrum v. Marcrum, 181 N.J.Super. 361, 363, 437 A.2d 725 (App.Div.1981) ("[a]nnexed to the verified complaint were two reports of psychological evaluations and a hospital record detailing the wife's alleged alcoholic problem."), certif. granted, 89 N.J. 402, 446 A.2d 136, and appeal dismissed, 93 N.J. 232, 460 A.2d 645 (1982). In Marcrum, based on such evidence, Judge (now Justice) Coleman wrote for this court:
We are satisfied that when children are residing in New Jersey with a parent for a significant period of time, and that parent alleges that the children will be mistreated and irreparably harmed if they are returned to the nonresident parent, New Jersey has and should exercise jurisdiction and conduct a plenary hearing to determine the merits of such allegations. The polestar in such cases is, as it should be, the best interest of the children.

[Id. at 365, 437 A.2d 725.]
By contrast, defendant's certification in support of injunctive relief in this case consisted of conclusory allegations with little evidentiary support. Compare Dorfman v. Dorfman, 315 N.J.Super. 511, 517-18, 719 A.2d 178 (App.Div.1998) (where we noted that the child's problems with a shared parenting arrangement had been well documented and therefore warranted at least "an investigation of the problem."). In light of defendant's allegation of statistical evidence purporting to show "the high percentage of ... anti-social behavior by juveniles living in single-mother households," and his contention that those statistics supported a change in custody (to the father's single-parent household), defendant's allegations respecting Kevin's life with his mother might have warranted some degree of skepticism by the court.
The timing of defendant's application by Order to Show Cause, as plaintiff's attorney pointed out at the first argument on August 13, also suggested a closer look. The attorney argued:
Mr. Peregoyaccording to his papers it would seem that these concerns were present at the beginning of the summer and he could have started this application at the beginning of the summer. He waited until a week before the child was due to be returned to school, Judge.

*397 .... [I]f there was genuine concern, the application would have been brought much sooner.
In the seven years that Kevin had lived with his mother in Oklahoma, spending summers and periodic weeks with his father in New Jersey, defendant never sought the intervention of the courts in any aspect of Kevin's custody. Nor had he sought the assistance of any child welfare agency in New Jersey or Oklahoma with respect to Kevin's well-being. That seven-year history does not appear to have received consideration either in the entry of the order to show cause or in continuing the injunction on the return date.
Among defendant's allegations, repeated by Dr. Weinstein, were that plaintiff's physical custody of Kevin during most of the year interfered with defendant's relationship with Kevin. Clearly that was not a proper factor in the decision to issue injunctive relief. Defendant had agreed to plaintiff moving with Kevin to Oklahoma seven years earlier and had lived with that arrangement without any record of objection for seven years. Moreover, we can assume that any reversal of the custody and visitation arrangement would similarly affect plaintiff's relationship with Kevin. That is the nature of a two-state parenting arrangement. See generally, Baures v. Lewis, 167 N.J. 91, 770 A.2d 214 (2001).
Subsumed in the determination that defendant's allegations met his burden under Crowe for injunctive relief, was a determination that he presented a prima face case of changed circumstances, which in turn triggered a full custody investigation. See M.P. v. S.P., 169 N.J.Super. 425, 431, 404 A.2d 1256 (App.Div.1979):
Since the conditions which would satisfy the best interests of a child during all of its minority cannot be conclusively determined in a single decree, custody orders are always held to be modifiable upon a showing of changed circumstances that would affect the welfare of the child. The party seeking the modification bears the burden of showing sufficient changed circumstances so as to require modification. In assessing a claim of changed circumstances deference is given to the length and stability of the existing custody relationship.
We do not fault the first judge's discretionary decision to initiate a custody investigation, although as noted, defendant's prima facie case was suspect. However, such an investigation could surely have been conducted under the auspices of an Oklahoma court. Moreover, we see no evidence that a full custody investigation ever took place in New Jersey, as required by R. 5:8-1. In any event, we cannot condone the second judge's decision to change Kevin's residential custody from his mother to his father on a permanent basis without the benefit of a plenary hearing.[15]See Mackowski v. Mackowski, 317 N.J.Super. 8, 721 A.2d 12 (App.Div.1998); G.C. v. M.Y., 278 N.J.Super. at 367, 651 A.2d 110; Luedtke v. Shobert, 342 N.J.Super. 202, 776 A.2d 233 (App.Div.2001). Our courts have repeatedly held that so drastic a decision as a change in child custody cannot be made on the basis of conflicting certifications, as occurred here. E.g., P.T. v. M.S., 325 N.J.Super. 193, 214, 738 A.2d 385 (App.Div.1999); Wilke v. *398 Culp, 196 N.J.Super. 487, 501, 483 A.2d 420 (App.Div.1984), certif. denied, 99 N.J. 243, 491 A.2d 728 (1985); Fusco v. Fusco, 186 N.J.Super. 321, 327, 452 A.2d 681 (App.Div.1982). The Oklahoma report, which detailed the family's history and present living arrangements, concluded with the recommendation that Kevin be returned to plaintiff's custody.
The judge's decision here was made without the benefit of interviewing the child, and without any explanation for declining plaintiff's request to do so. Rule 5:8-6 provides, in pertinent part, that "[a]s part of the [required] custody hearing, the court may on its own motion or at the request of a litigant conduct an interview with the child(ren).... If the court elects not to conduct an interview, it shall place its reasons on the record." The failure to interview the child or to explain that decision is further evidence of an insufficient record to justify the final order.
The second judge gave far too much weight to the abbreviated "note" from Ms. Holt to the first judge. Ms. Holt's credentials are not set forth in the record. We recognize the value of a Probation Department social worker's investigation in a child custody matter. The social worker can provide valuable, objective information to the court respecting the child's living conditions at home, his schooling, and other activities. No such detailed investigation is evidenced in the record.[16] The brief note submitted to the court by Ms. Holt did not constitute either expert psychological opinion respecting the child's best interest or the fruits of an in-depth study. While truly expert testimony in a child custody case can be invaluable, Kinsella v. Kinsella, 150 N.J. 276, 318-19, 696 A.2d 556 (1997), no court may delegate its responsibility for a final custody or visitation decision to any expert, no matter how well qualified. P.T. v. M.S., 325 N.J.Super. at 216, 738 A.2d 385. It was clearly error to make a final decision in this disputed custody matter on the return date of a motion, to reject plaintiff's request to consider the Oklahoma report and to conduct a plenary hearing, and not to provide findings of fact, contrary to R. 1:7-4 as well as R. 2:10-5.[17]
It is axiomatic that the courts have a special obligation to protect children who are the subject of disputed claims to custody.
The "best-interest-of-the-child" standard is more than a statement of the primary criterion for decision or the factors to be considered; it is an expression of the court's special responsibility to safeguard the interests of the child at the center of a custody dispute because the child cannot be presumed to be protected *399 by the adversarial process. That responsibility was perhaps best articulated by Judge Cardozo: [The Chancellor] acts as parens patriae to do what is best for the interest of the child. He is to put himself in the position of a "wise, affectionate, and careful parent" and make provision for the child accordingly.... He is not adjudicating a controversy between adversary parties, to compose their private differences. He is not determining rights "as between a parent and a child," or as between one parent and another.... Equity does not concern itself with such disputes in their relation to the disputants. Its concern is for the child.
[Kinsella, 150 N.J. at 317-18, 696 A.2d 556 (1997) (citations omitted).].
Although not requested by either party, this case likely would have benefitted from the appointment of a guardian ad litem to protect the child's best interest and to present an independent perspective. See R. 5:8B. See also R. 5:8A (allowing appointment of counsel for the child); R. 5:8C (allowing the appointment of a volunteer Court Appointed Special Advocate (CASA), who may act "on the court's behalf to undertake certain activities in furtherance of the child's interests" in a county where a CASA program exists.)
Where one parent resides in a distant jurisdiction, and particularly where the parties' finances appear to be limited,[18] it is likely that the non-resident parent will be handicapped by practical limitations on his or her participation in proceedings in the distant forum.[19] Limited participation that may not be entirely voluntary is likely to deprive the court of a complete picture, which in turn impacts the court's ability to make decisions in the child's best interest. The child himself may have perceived his mother's absence as an abandonment, especially where there was no neutral, objective person to explain the proceedings, and the major change in his life, in an appropriate way. On remand, if New Jersey is determined to be the appropriate forum to exercise jurisdiction, the court should consider whether an appointment authorized by R. 5:8A or 5:8B or 5:8C would serve the child's best interest.
We reverse the order changing permanent physical custody of Kevin to defendant. We remand the matter for a determination, after consultation with the appropriate judge in Oklahoma, whether Oklahoma or New Jersey should exercise jurisdiction over Kevin's primary physical custody. If it is determined that New Jersey and not Oklahoma is the more appropriate forum, the Family Part must obtain a full custody investigation and schedule a plenary hearing with all deliberate speed. The court must consider interviewing Kevin, consistent with R. 5:8-6. The hearing may include testimony taken in Oklahoma under procedures consistent with N.J.S.A. 2A:34-46 and -47. See 43 Okla. Stat. Ann. § 551-111. Finally, any decision shall include detailed findings of fact, addressing the factors set forth in N.J.S.A. 9:2-4 respecting child custody determinations.
We also reverse and remand for reconsideration the child support determination *400 set forth in the January 12, 2002 order.[20] In addressing child support fairly due from plaintiff to defendant as of the date of that order, and pendente lite, the court is to reconsider whether to include in the calculation any additional gross income from defendant's self-employment and whether plaintiff's income should have been adjusted for any period on account of support provided to her older son, all in accordance with the Child Support Guidelines. Of course, a final decision on child support must await a final custody determination.
Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] N.J.S.A. 2A:34-29 provides:

The Legislature finds that this act is necessary in order to:
a. Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being;
b. Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child;
c. Assure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available, and that courts of this State decline the exercise of jurisdiction when the child and his family have a closer connection with another state;
d. Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child;
e. Deter abductions and other unilateral removals of children undertaken to obtain custody awards;
f. Avoid relitigation of custody decisions of other states in this State insofar as feasible;
g. Facilitate the enforcement of custody decrees of other states; and
h. Promote and expand the exchange of information and other forms of mutual assistance between the courts of this State and those of other states concerned with the same child.
[2] Plaintiff was married to someone else before her first marriage to defendant; defendant was married to someone else between his two marriages to plaintiff.
[3] The traditional designation "property settlement agreement" is a misnomer to describe an agreement settling the issues arising in a divorce proceeding when custody and visitation are among those issues. Plainly, a child is not property. Perhaps it is time to name such an agreement simply the "divorce settlement agreement."
[4] Prior to the parties' agreement, the court conducted a Holder hearing on plaintiff's request to remove the child to Oklahoma. See Holder v. Polanski, 111 N.J. 344, 544 A.2d 852 (1988). The record before us does not reveal whether the court issued a ruling before the parties entered into their custody agreement.
[5] The letter purports to be an "affidavit," but is simply a letter and lacks the substance or form of an affidavit.
[6] On the form of order proposed by defendant, the judge changed the word "will" to "may" so as to state "[t]hat if Kevin is returned to his mother and returned to Oklahoma... Kevin may suffer irreparable harm." (Emphasis added).
[7] The memo also noted Ms. Holt's "concerns that this boy is struggling with a juvenile version of clinical depression" and recommended allowing Kevin to visit with his mother "if she appears" on the August 13 return date. Finally, Ms. Holt reported that Kevin "expressed strong concerns that `she is really mad at me' because she knows he wants to live with his dad now.... He really is upset."
[8] In the interim, there apparently had been proceedings before a third judge on a probation application to enforce arrears owed by defendant for child support.
[9] On January 11, the judge referred in his decision to "Ms. Holt's report" as "extensive" and detailed, recommending custody with defendant in New Jersey. Neither party has included such a report in the record before us, and our inquiry through the Clerk's office has produced none.
[10] When a litigant represents himself on appeal, he is subject to the Rules of Court, and defendant's attempt in his appellate brief to present additional facts that purport to support the decisions in the Family Part is improper. See R. 2:6-2.

We also note that the Appendices filed by each party contain duplications too numerous to count, contrary to R. 2:6-1 and R. 2:6-3.
[11] The PKPA sets forth the conditions under which a court must give full faith and credit to a prior custody order issued by another court. In furtherance of the federal statute's purpose to prevent conflicting orders concerning a child's custody, and also to discourage parents from fleeing with a child to seek a more favorable determination in another forum, the federal act requires the second forum to defer to the continuing jurisdiction of the original forum in most cases, unless that court determines either that it has lost or should not exercise jurisdiction. But that deference does not impose jurisdiction on the original forum, nor does it require the original forum to exercise its jurisdiction.
[12] Writing for the court in Ivaldi, Justice Pollock noted that the Court's "holding conforms also with a proposed revision of the UCCJA, entitled the Uniform Child Custody Jurisdiction and Enforcement Act (`the UCCJEA'), which is under consideration by the National Conference of Commissioners on Uniform State Laws." 147 N.J. at 202-03, 685 A.2d 1319 (footnote omitted).
[13] We note that a full custody investigation was ordered by the first judge on August 6, 2001.
[14] It is not clear from the record before us why the Family Part judge in New Jersey did not have that report before him until the day of the final argument on custody in January 2002 or why, once in his possession, he concluded that it was too late to consider it. The report was provided to the New Jersey court by the Oklahoma Department of Human Services after correspondence with Ms. Holt in the Ocean County Probation Department. It was not plaintiff's submission, for which she reasonably could be held responsible for its filing or service. Moreover, where critical information relative to a child's best interests is known to be available, the courts must be flexible in applying otherwise applicable procedural rules. Cf. Kinsella v. Kinsella, 150 N.J. 276, 318-19, 696 A.2d 556 (1997) (rules of evidence applicable to most adversary proceedings must be flexibly applied in child custody matters).
[15] The January 12 order says: "Custody of minor child shall remain with father in New Jersey. Mother shall have reasonable and frequent visitation...." In the absence of an express contrary ruling, we do not read that order to modify that portion of the parties' original agreement that provides "joint legal custody." We assume the order refers to primary residential custody being granted to defendant, whereas the agreement provided "primary residential custody" to plaintiff.
[16] As noted above, we see no report in the record before us, other than the August 9, 2001 one-page note. Had the judge issued findings or reasons pursuant to R. 2:10-5, perhaps we would have some explanation. The judge's remarks on January 11, 2002 suggest excessive reliance on Ms. Holt's "experience and proficiency in matters of this nature," without her testimony or cross-examination, and without the testimony of the parties.
[17] At the close of the argument, the following exchange took place between plaintiff's attorney and the judge:

MS. KERR: Judge, just finally. Is the custodial finding a final Order? Are we not having a hearing? What is the Court's position on scheduling any furtheror are there no further actions of the Court?
THE COURT: I've made my finding that custody remains with the father in the State of New Jersey. I leave it to counsel's knowledge of the law and the procedure to do whatever she deems appropriate or not do whatever she deems appropriate. I'm not making any advisory rulings.
[18] On January 11, 2002, in denying counsel fee applications by both parties, the judge found "that the parties are in equally dire financial straits."
[19] It appears, for example, from the transcript of proceedings on August 13, 2001, the return date of the Order to Show Cause, that plaintiff's physical absence from the courtroom resulted in some negative inference that may or may not have been appropriate under all the circumstances. Her attorney represented that "she is available by telephone in Oklahoma."
[20] The order, entered on January 12, 2002, stated that child support "was calculated with plaintiff's income at $27,585 annually and defendant's at $26,000. No other dependency exemption granted."