NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4030-12T2

D.A.[1],

    Plaintiff-Respondent,

v.

R.C.,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

December 22, 2014

APPELLATE DIVISION

       Submitted March 19, 2014 — Decided December 22, 2014

       Before Judges Fuentes, Fasciale, and Haas.

       On appeal from Superior Court of New Jersey,
       Chancery Division, Family Part, Hudson
       County, Docket No. FD-09-1520-02.

       The Abraham Law Firm, LLC, attorneys for
       appellant (Markis M. Abraham, on the brief).

       D'Alessandro & Cieckiewicz, P.C., attorneys
       for respondent (Lori Cieckiewicz and Jaclyn
       Nayar, on the brief).

       The opinion of the court was delivered by

FUENTES, P.J.A.D.

    Defendant R.C. appeals from the order of the Chancery
Division, Family Part denying his motion seeking reconsideration
of a prior order of the court which reaffirmed and enforced a

---

[1] The court elects to use initials for the parties to protect the
identities of the minor children.

parenting time schedule that was part of a Consent Order entered by the parties ten years earlier. Defendant argues the motion judge erred in failing to compel the parties to submit to mediation or alternatively conduct a plenary hearing to address and resolve the disputed material factual issues raised by the parties. Most importantly, defendant argues the judge failed to interview the fourteen-year-old child at the center of this dispute, as mandated by Rule 5:8-6, and failed to "specifically place on the record the factors which justify any custody arrangement not agreed to by both parents." N.J.S.A. 9:2-4(f).

After reviewing the record developed before the Family Part, we agree with defendant's arguments and remand this matter for the trial judge to refer this matter to mediation as required under Rule 5:8-1. If mediation fails to resolve the custody and parenting time issues raised by the parties, the judge shall then conduct a plenary hearing to resolve the factual disputes contained in the parties' account of events, and thereafter place on the record his factual findings and conclusions of law as required by N.J.S.A. 9:2-4(f) and Rule 1:7-4(a). As part of this hearing, the judge must comply with the requirements of Rule 5:8-6 by either interviewing the parties' now sixteen-year-old son concerning the custody and parenting time issues raised by his parents, or otherwise place

on the record the reasons for his decision not to interview this child. In reaching this decision, the judge must consider the factors outlined in N.J.S.A. 9:2-4(c), including "the preference of the child," given his age and capacity to reason.

We discern the following facts from the record developed before the Family Part.

I

The parties had a dating relationship from 1996 to 2000. Their son "Jeremy" (a fictitious name to protect his privacy) was born in December 1998. Represented by separate counsel, the parties agreed to mediate the legal issues concerning their son and entered into a Consent Order for Joint Custody and Parenting Time dated April 26, 2002. This Consent Order comprehensively addressed and resolved all of the issues generally associated with the rearing of the parties' then three-year-old son, including agreeing that the child would reside with plaintiff (mother), while giving defendant (father) "reasonable and liberal parenting time with the child." The Consent Order included a detailed description of the terms governing defendant's parenting time with his son.

Neither party sought judicial intervention to modify the terms of this Consent Order until defendant filed a motion on November 7, 2012, "requesting changes in the custody/parenting

time terms of the [consent] order to reflect the current practice and agreement." Defendant claimed plaintiff had voluntarily agreed to this modification permitting Jeremy to reside with him because her relationship with her then thirteen-year-old son had deteriorated and become too difficult to handle, given the demands of time and effort associated with her then recent employment as a police officer.

Defendant attached to the notice of motion an "information sheet" dated October 28, 2012, setting forth the basis for his request that the court recognize and approve what he claimed was a de facto, mutually agreed upon voluntary modification of the custodial arrangement established in the 2002 Consent Order. The following account of events is based upon the allegations defendant made in support of this motion. Specifically, defendant claimed that since the Consent Order "was issued almost ten years ago, the [p]laintiff and I have on many occasions informally modified the custody and parenting time terms of the Court Order to better align with [Jeremy]'s needs and best interest." Although he recognized that his son had been academically successful during the time he had resided with his mother, defendant claimed the child had also experienced "intermittent disciplinary and behavioral issues . . . ."

These issues became more acute as the boy reached his teenage years. Defendant attributes his son's behavioral problems, at least in part, to plaintiff's "parenting style," which defendant characterizes as "ill-suited and ineffective in addressing" Jeremy's disciplinary problems. Defendant alleges he "regularly got phone calls" from both plaintiff and Jeremy "expressing frustration and anger, or complaints about the other."

The relationship between Jeremy and his mother continued to deteriorate during the boy's pre-teen years. Eventually plaintiff told defendant that "she thought it would be better if [Jeremy] lived with [him] permanently." Defendant claimed that during the summer of 2012, when Jeremy was thirteen years old, he and plaintiff "reached [an] agreement that [he] would take primary custody of [Jeremy], to begin 'officially' when school started in September [2012]." They agreed upon a parenting time schedule that permitted Jeremy to meet with his mother on Wednesdays "after school" and stay with her overnight on "alternate weekends." Defendant represented to the court that this arrangement "has been in effect at least since September [2012]."

With respect to child support, defendant claimed plaintiff agreed to file a motion to modify the Consent Order "to reflect

this understanding in December 2012 when she graduated from police academy training. In the meantime, [p]laintiff agreed that she would reimburse me in the amount of the child support payments I made pending the modification." According to defendant, he decided to file the motion seeking judicial recognition of this oral agreement because plaintiff told him "she did not have time [to do it herself] because she was too busy due to her police academy obligations."[2]

Plaintiff submitted her own certification disputing all of the material allegations defendant made in support of his motion. As a starting point, plaintiff emphasized defendant "has a law degree from Harvard and a MBA [Master's Degree in Business Administration] from the University of Pennsylvania." She described defendant's conduct during their initial attempts in 2002 at resolving the custody and parenting time issues as confrontational and less than completely candid and forthright on defendant's part. She was nevertheless thankful that they were able to reach an agreement that lasted for eleven years "except for very brief periods of time."

---

[2] Defendant's reply certification included an alleged verbatim account of a series of electronic text messages exchanged by the parties from October 18, 2012 to October 23, 2012, in which plaintiff acknowledges her intent to "drop" defendant's child support obligation in recognition of Jeremy's new custodial status. Unfortunately, these text messages were not authenticated by the trial court.

Plaintiff cited the summer of 2012 when she began her academy training to become a police officer as an example of one of the "brief" departures from the custodial arrangement reflected in the 2002 Consent Order. Because the time demands imposed on her by this training coincided with defendant being unemployed, plaintiff "thought it would be a fine opportunity for 'father and son' to spend more time together." She insisted, however, that this was a temporary custodial arrangement intended to end when she graduated from the police academy on December 14, 2012. Because the exigency that necessitated this custodial arrangement had ended, plaintiff claimed it was in her son's best interest to return to her home.

With respect to her son's welfare, plaintiff alleges Jeremy "is exposed to violence at [defendant's] home and that his needs are being neglected." Her concern over her son's safety emanates from defendant's wife. Plaintiff characterizes defendant's relationship with his wife as "quite violent." She claims three domestic violence restraining orders have been filed between defendant and his wife, "believes" each has filed municipal court charges against the other, and claims "the police have been called to the home on multiple occasions." She thus fears that Jeremy is "often put in the middle" of

defendant's violent and dysfunctional relationship with his wife.

By way of proof, plaintiff presented to the trial court (and included in the appellate record) three emails allegedly sent by Jeremy on the morning of April 11, 2012. The first email, sent at 9:22 a.m., states: "MOM CALL THE POLICE SEND THEM TO MY DADS [sic] HOUSE [naming defendant's wife] HAS A KNIFE PLEASE CALL PLEASE CALL THE POLICE AND SENT THEM TO [defendant's home address]! PLEASE PELASE [sic] PLEASe [sic]." The second email, sent at 9:23 a.m., states: "CALL THE POLICE AND SENT IT TO MY DADS [sic] HOUSE PLEASE PLEASDE [sic] PLEASE." The third and final email, sent at 9:24 a.m., states: "SEND THEM TO MY DADS [sic] HOUSE SEND THEM TO MY DADS [sic] HOUSE."

Plaintiff claims she was shopping one block away from defendant's residence when she received the first email, and "rushed over." When she arrived at defendant's apartment, she "had to knock on the door really hard and had to yell out for him." When she finally gained access to the apartment, her son told her

> that he locked himself in his room when he saw the knife. As we were leaving, I saw [defendant] outside the building with his daughter [identifies her by name]. I asked him what happened. He simply said that "[his wife] was having a hormonal moment and left the house."

Plaintiff characterizes defendant's response to the violence between him and his wife as "unacceptable." As a result, she "did not allow [Jeremy to go his father's home] for the next 3 weeks." Plaintiff also claims that at some unspecified time defendant and his wife were involved "in a court battle for their [six-year] old daughter." It is plaintiff's "understanding" that defendant's wife "lost the case because of her violent tendencies and her drug use." Plaintiff alleges defendant and his wife "have since reconciled and live together." Plaintiff concluded this aspect of her certification by describing defendant's home as "an unstable, violent place for our son. A custody transfer to [defendant] would not be in [Jeremy's] best interest whatsoever."

Despite making these highly inflammatory allegations against defendant and his wife, plaintiff conceded that she "modified" the custodial arrangement at the start of Jeremy's freshman year of high school for "approximately two months." She claims, however, that the custodial arrangement defendant described in his statement ended when defendant's wife "started having problems with our son." Specifically, plaintiff claims defendant's wife called her to complain about having to drive Jeremy around because he "wasn't her child or her responsibility." Instead of immediately terminating the

arrangement, plaintiff claims she told defendant's wife "to discuss the matter with [defendant]. After all, [Jeremy] was his responsibility as well."

Plaintiff describes her personal life as nonviolent and happy. She has a stable relationship with "another police officer." She claims her "'significant other' loves [Jeremy] and [Jeremy] loves him." She does not have a criminal record and "look[s] forward to a long career with [the] [p]olice [d]epartment." Finally, because she does not have any other children, she can focus her attention on Jeremy.

Defendant filed a reply certification noting that he had not made any inflammatory allegations against plaintiff in support of his motion, and then lamenting the ad hominem attacks plaintiff had made against him and his wife. Defendant addressed and refuted the many instances of impropriety alleged by plaintiff. He also emphasized that plaintiff had not objected to his regular overnight contacts with his son since 2010.

Despite defendant's alleged intent to remain above the fray and take the moral high ground in this dispute, his reply certification is replete with disparaging allegations of plaintiff's confrontational parenting style, including resorting to striking Jeremy "repeatedly with a broomstick" and

threatening him "with a baseball bat." We pause here to note the same seeming contradictions in defendant's position we noted when we reviewed plaintiff's certification. That is, despite these highly disturbing accusations and concerns about plaintiff's parenting style, defendant allowed his young son to reside with his allegedly violent mother for over ten years.

## II

### The First Hearing

Both sides were represented by counsel at the time defendant's motion to modify the 2002 Consent Order came before the Family Part on December 21, 2012. Unfortunately, the attorneys' demeanor and arguments echoed the vitriolic tone reflected in the warring certifications submitted by their respective clients. We are compelled to note at this time the informality with which the trial judge conducted this motion hearing. Although the parties were technically "sworn" by a Sheriff's Officer at the start, the environment created by the informal, conversational style of the proceeding was more akin to a mediation session than an adjudicative hearing. This had the unintended, yet unfortunate effect of yielding more heat than light, ultimately leaving unresolved the central issues raised by the parties.

The judge interacted with the parties on the record in a highly informal manner, asking questions and receiving material and conflicting factual assertions in response from both the parties and their respective counsel. Despite these conflicting material accounts involving key events, the judge seemed at times to accept or reject these proffers and representations without having the benefit of a factual record developed through a traditional evidentiary hearing.

Through this freewheeling colloquy, plaintiff conceded that Jeremy had been residing with defendant since she entered the police academy at the start of the summer of 2012. In fact, when the judge asked plaintiff whether "as a practical matter," Jeremy resided with his father "right now," plaintiff answered: "Right now he's staying there, yes."

However, defendant asserted (without being subjected to cross-examination) that by mutual agreement with plaintiff, Jeremy had been residing with him since he graduated eighth grade in 2010. The judge addressed defendant directly to ensure he understood his position:

> THE COURT: Okay. So your position is since 2010 [Jeremy] has been -- when you say staying with you what do you mean by that?
>
> . . . .
>
> DEFENDANT: Yes, Your Honor. I mean Monday through Friday with an understanding that he

would -- she -- he would be over with her on the weekends. And -- and actually quite frequently during those weekends because of the confrontations that they would have he would actually call me to have him -- pick him up . . . . So actually he would end up spending more than that.

Defendant's counsel asked the judge "to put the same question to [plaintiff.]" In response, the judge asked plaintiff: "What do you have to say?" After some equivocation, plaintiff denied defendant's account and offered to produce her parents and other friends as witnesses to support her position. In the midst of this freewheeling exchange, the judge made the following comment:

> THE COURT: We can -- and we can have [Jeremy] come in here too, but I really don't want to do that.
>
> DEFENDANT'S COUNSEL: Right.
>
> THE COURT: All right. Let me make that clear. But don't -- let's -- let's hope it doesn't come to that now, all right.[3]

Despite the parties' intransigence and conflicting positions, the motion judge continued to press for some form of mediated solution. Showing his frustration, the judge addressed the parties directly and asked: "Why do I have to make a decision for the two of you about where your son should stay?"

---

[3] The judge specifically noted, however, that Jeremy was an "obviously . . . very smart" fourteen-year-old boy.

The record shows that fourteen transcript pages of argument and colloquy transpired thereafter. The judge never received a direct answer to his poignant, yet seemingly rhetorical question. At that point, the judge addressed the parties once again with these final words:

> All right. I'm going to say something -- now, I'm going to say something. [Addressing plaintiff] Let's stop talking about [defendant's wife] too, all right, if you don't mind. I know you don't mind.
>
> I -- I think, look, I'm -- I'm trying to resolve it, I want to resolve it. It doesn't make sense for the both of you to keep coming back here.
>
> The both of you are working. The both of you are intelligent people. Now, come on. Now, the court order that was in effect which has not been amended since 2002, correct?
>
>     . . . .
>
> All right. Then that's what I am inclined to continue in effect. Now, the question becomes what are we going to do to effect liberal parenting time. And when I say liberal I don't mean necessarily every other weekend, and I don't know if there's some other way we can effectuate long weekends or what. I don't know, and I'm not going to go through here trying to work out a parenting schedule, all right.
>
> Now, you can either go to mediation, you can go today if we can arrange it, or the two of you, or all four of you can go into my conference room, sit down, and come up with a parenting schedule where [defendant] gets liberal parenting time.

A-4030-12T2

. . . .

> We can do that . . . We can send the parties to mediation and see what develops. I'd like to think, as I said, and I'm not saying this -- and I don't say this to everyone who appears in front of me, you're two very intelligent people. Take a step back for a moment and try to work this out. Yes or no? Are going to try to do something since we have the parties here?

As an accommodation to the attorneys' schedule, and in light of the pending holiday recess, the court scheduled the matter to return for mediation on Thursday, January 10, 2013.

### III

### The Second Hearing

When the parties returned on January 10, 2013, nothing substantive had changed. The parties remained barricaded behind their intransigent, materially-conflicting positions. Plaintiff's counsel apprised the judge that "because there has been no specific parenting plan [defendant] has taken it upon himself to keep the child and take the child sometimes more often than not thereby basically ignoring Your Honor's court order and thereby depriving my client of residential custody." Defense counsel responded by asserting that the parties were

> at an impasse in terms of residential custody. There's this kind of amorphous liberal parenting time plan where the 14-year old who wants to stay at his father's house, has demanded to stay at his father's

15

A-4030-12T2

house, has been staying at his father's house during the week and there has been ongoing conflict between the child and his mother. There's no violation of the court's order.

What we have is a 14-year old who is as big as [his father] who goes to school, who's successful in school, who wants to stay with his father. We have two parents. We have a mother who is demanding that the child stay at the house during the week when she's at work at -- at last report until eight o'clock at night and [defendant] has taken on the responsibility of being the custodial parent.

The proceedings continued to be conducted from this point on in the same informal manner that characterized the December 21, 2012 hearing. The attorneys continued to make conflicting factual representations to the judge without any competent evidence to support them. Plaintiff's counsel pressed the judge to reaffirm his prior ruling and order, and reaffirm plaintiff's role as the residential custodial parent. As the following passage indicates, however, in making this argument plaintiff's counsel implicitly conceded defense counsel's claim that the child was, as a matter of fact, residing on a fulltime basis with his father:

PLAINTIFF'S COUNSEL: Your Honor's order needs to be enforced. This 14-year-old child is being a 14-year-old child. He's being rebellious. He doesn't like the discipline that my client has at her home. At [defendant]'s home he gets to sit in his room all day playing his computer games.

THE COURT: All right.

PLAINTIFF'S COUNSEL: And that's not what happens at [plaintiff]'s home. So I ask that Your Honor finalize this case, end this case, not let a 14-year-old dictate the terms of a court order, remind [defendant] that there is an enforceable court order in -- it's actually a criminal violation, Judge, as Your Honor knows better than anyone else, to deprive someone a court-ordered custody or parenting time for more than 24 hours. He's done that time and again [apparently referring to defendant].

This vitriolic exchange of unsupported accusations by the attorneys continued throughout this hearing, interrupted intermittently only by the judge's acknowledgment of any particular statement. At one point, defense counsel stated:

DEFENSE COUNSEL: I think that the [c]ourt should, A, determine what the real problem is here, because if this 14-year old wanted to go stay at his mother's that's where he would be. [Defendant] has said it to me. If the child wants to get on the bus after school and take the bus to his mother's house he could do that.

. . . .

[T]hat's true that he's been with [defendant] for two years. And determine -- and determine what this child is saying, because I have a client who's telling me, this child, -- and I say child, he's 14, wants to stay with me, is doing well with me, has conflict with his mother. And you have a mother saying the child should be with me because there's an order from 2002 that says that he should be with me. I

17

think the [c]ourt needs to determine exactly what -- which of those things is true.

THE COURT: Yeah, well how do I do that?

DEFENSE COUNSEL: Well, A --

PLAINTIFF'S COUNSEL: And -- and the way my --

THE COURT: How do I --

. . . .

PLAINTIFF'S COUNSEL: Hold on.

THE COURT: No, wait a minute, wait a minute, hold on. I'm directing the question to [defense counsel].

DEFENSE COUNSEL: Okay.

THE COURT: How do I do that?

DEFENSE COUNSEL: A, take testimony from the parties; B, interview the 14-year old, because he is certainly mature enough to express to the [c]ourt --

PLAINTIFF'S COUNSEL: I would object to that, Judge.

DEFENSE COUNSEL: Of course they --

THE COURT: Well -- well, you see, now this is where we -- this is where we go because I test -- taking testimony from the parties is not going to give me the insight that I need because, as you said, they are diametrically opposed. Their [perspective] of what's going on, all right, is of course, tainted.

DEFENSE COUNSEL: . . . I think what the [c]ourt needs is a third-party [perspective] on exactly what's going on, because I think the [c]ourt is right, when you're faced with

two diametrically opposed views I think that an interview with the child, or at the very least appointing an evaluator, a psychologist to look at the child, look at the parents, and find out exactly what's going on. Because otherwise there's not going to be a resolution, because the parties are not going to agree.

[(Emphasis added).]

Plaintiff's counsel continued to press for enforcement of the judge's supposed "final decision" requiring residential custody to remain with plaintiff and relisting the matter only for a determination of the parenting time arrangement. Plaintiff's counsel concurred with the judge's decision that taking testimony from the parties in a formal evidentiary hearing, subject to cross-examination "is not going to resolve anything." With respect to the suggestion that the judge interview Jeremy, plaintiff's counsel stated:

PLAINTIFF'S COUNSEL: I will go a step further than that[,] to bring a 14-year old in, a very smart, perceptive, intelligent, understanding 14-year old into Your Honor's chambers, into what is a very, no offense to any of us, unpleasant atmosphere and choose. Well, there's police officers here, there are people being handcuffed here. The child is going to know.

THE COURT: I'm a very pleasant fellow --

. . . .

-- especially when it comes to dealing with children, I think.

19

. . . .

PLAINTIFF'S COUNSEL: -- <u>the other party is on drugs or a -- a heavy drinker. Your Honor listened to what needed to be said. Your Honor listened to all the allegations by both sides and made a decision, a final decision</u>. And now we need to -- the only outstanding issue is [defendant]'s parenting.

. . . .

THE COURT: [Y]ou know what we're going to have to do maybe, maybe we're going to have to have split custody. Maybe we're going to have to have 50/50 split. In fact, the more I hear about this situation the more I think that that's probably what has to happen. Split the custody 50/50, come up with the days, and that's what -- that's what we're going to have to do. It's a 14-year-old boy.

Now, let me say this, <u>I'm not sure what he's telling his father, but I think . . . that there is an issue about him wanting to stay with his father</u>. Now, whether that's because he's given, as you say, <u>maybe too much freedom as opposed to when he's with the mother, that could be</u>, but you know, I think <u>right now that the only way that this gets resolved with a 14-year-old boy is to have a split custody situation and he will have to be told in no uncertain terms that that's what the [c]ourt order is</u>. And he will have to abide by the order. And both parents, of course, have to abide by the order.

[(Emphasis added).]

Several more transcript pages later, defendant addressed the judge directly as follows:

> DEFENDANT: The [custody arrangement] that's proposed now, given what's happened just since the last time we were in this courtroom in trying to -- to have [Jeremy] abide by that agreement. It doesn't work. I don't like being put in the position where I'm made to somehow look like I'm in contempt because --
>
> THE COURT: No, I'm not saying you're in contempt.
>
> DEFENDANT: -- he absolutely refuses to go with his mom or -- or to leave when she comes to pick him up.

The judge then asked defendant if certain variations with the days of the week in the custody order would be likely to obtain Jeremy's compliance. This prompted defendant to respond: "We can put in another order, but I'm almost certain that we'll be right back here again because he will not abide by it." Thereafter, plaintiff's counsel again pressed the court to reaffirm what he claimed to have been the court's prior order, giving plaintiff full residential custody of her son. With respect to defendant's admonition, emphasizing the likelihood that Jeremy would "not abide" the court's order, plaintiff's counsel argued that "[t]his child has to be encouraged and pushed to comply with the order." (Emphasis added).

This prompted the following response by the judge:

> THE COURT: All right, here's the order of the court. It's split custody 50/50. You [work] out a plan how you do it, all right. You work it out, you give it to me before

21

the end of the day. That's the order of the [c]ourt.

PLAINTIFF'S COUNSEL: Why doesn't Your Honor -- we're gonna --

THE COURT: If you don't like it -- if you don't -- if either party doesn't like it appeal it. That's the order of the [c]ourt.

. . . .

[T]ell the young man he's got to abide by the [c]ourt order.

On January 17, 2013, just one week after the court's order, plaintiff filed an Order to Show Cause (OTSC) against defendant before a different judge seeking Jeremy's return by "8:00 p.m. on January 18, 2013." Plaintiff submitted a certification claiming defendant had "completely disregarded" two court orders and as a result, she had not seen her son in ten days. To induce the court to issue this emergent relief, plaintiff averred that defendant: (1) refused to bring Jeremy to her home; (2) rebuked her efforts to retrieve Jeremy; (3) "almost never answers" her phone calls; and (4) had told Jeremy not to come home.

On January 15, 2013, plaintiff sent her sister to pick up Jeremy at defendant's home, and "[w]hen she was unsuccessful, [her sister] called the police." Plaintiff did not have any personal knowledge of what transpired when police officers arrived at defendant's home in response to her sister's call.

22

Despite this legal impediment, plaintiff averred to the judge who issued the OTSC that "[s]hortly after the officers arrived, [defendant] told them that we were still 'waiting for a decision' and the 'court process is still going on.' This was a blatant, bold-faced lie!!!"

Plaintiff asked the OTSC judge to issue a warrant for defendant's arrest if he failed to comply with the emergent relief she was seeking. The judge who entered the OTSC awarded plaintiff custody of Jeremy "until further order," and set the matter down for a hearing on January 24, 2013, before the first judge.

IV

The Third Hearing

The trial judge opened this hearing by expressing his regrets that the OTSC had been entered on the week he was on vacation. After this short preliminary remark, the judge addressed the parties and counsel directly stating: "[Y]ou guys can appeal me you can do whatever you want, but I'm going to say something. This is coming to an end. One way or the other. Today this is over. That's the preface."

Despite the judge's resoluteness and good faith efforts, the informality and disregard for the rules governing judicial proceedings continued unabated. By way of example, in response

to the judge asking plaintiff's counsel "what's been going on since [Jeremy] has been with your client over the past week?", counsel responded: "[Jeremy told] my client . . . 'I have no problem living by this 50/50 arrangement if you stop my father's child support.'"  This brazen attempt at impugning defendant's credibility with incompetent hearsay evidence was left unchallenged by defense counsel, and apparently accepted by the judge without reservation.  In fact, in response to plaintiff's counsel's assertion, the judge noted: "I'm concerned about what you raised about the child support statement."

This prompted some discussion about whether the provision in the 2002 Consent Order addressing child support should be amended to reflect the current joint-custody arrangement the judge had ordered on January 10, 2013.  The discussion returned to the issue of custody, and plaintiff's counsel claimed that things between Jeremy and his mother were going "smooth." Plaintiff's counsel also made the following representation to the court:

> [Jeremy] is 14-years old.  We have every confidence that if [Jeremy] was encouraged to comply by [defendant] that he would. He's an impressionable young 14-year-old man who has to -- really has to -- and I don't want to sound -- engage in psychobabble here, he has to compete for his father's attention with two younger children who also live in the home.  And so it's not

surponding that he's shown a bit of
[resistance].

But when he is -- when it's told to him and
it's emphasized that there are consequences
for non-compliance he stays out at the home.
He's been there since Sunday.

When asked by the judge to respond, defense counsel immediately seized upon his adversary's characterization of things going "smooth" between Jeremy and his mother to claim that in fact the converse was the case. According to defense counsel, "rough" was a more apt description of what had taken place since the police arrived at his client's home. Defense counsel noted the irony in this situation, because it was plaintiff's counsel who argued against the judge interviewing Jeremy in chambers to avoid exposing him to the traumatic experience of seeing armed police officers in the courthouse. At plaintiff's request, local police officers responded two times to defendant's home in the seven-day period between the January 10, 2013 hearing and the January 17, 2013 OTSC.

Defense counsel claimed to have seen text messages sent by Jeremy to his father asking him repeatedly to come and pick him up and take him away from plaintiff's home. According to defense counsel, Jeremy decided on his own to walk to his father's home, which is located approximately three miles from plaintiff's residence. Again, following the consistent theme of

25

this case, counsel's representation was unsupported by competent evidence. This prompted the judge to speculate: "Maybe he got ill because of all this constant bickering . . . between the mother and the father."

After again drifting into discussions concerning child support, plaintiff's attorneys responded to defense counsel's comments concerning Jeremy:

> PLAINTIFF'S COUNSEL: Your Honor knew that there would be some [resistance] to the child.
>
> THE COURT: Right.
>
> PLAINTIFF'S COUNSEL: There's less resistance now then there had been, because when Your Honor entered the first order, entered the second order, the kid said I'm not going, I don't care what any judge tells me. Now he's complying. That's progress, okay. He's at mom's house since -- for a week now, okay. Your Honor made a wise, <u>well-informed decision</u>. . . . I'm not trying to patronize Your Honor.
>
> . . . .
>
> PLAINTIFF'S COUNSEL: . . . After Your Honor entered the order from December 21st, 2012 giving my client residential custody and continuing the order from 2002 [defendant] took the child as he pleased, kept the child as he pleased.
>
> . . . .
>
> THE COURT: You made your point, you made your point why we're here. You made your point . . . . So let's not argue what we argued last time. Okay.

DEFENSE COUNSEL: Your Honor, the real problem here, and this is -- I guess it's a dispute, I guess it's something that the [c]ourt is going to have to get to the bottom . . . of, we have a 14-year old [boy.]

. . . .

We have a child that does not want to be at his mother's. You sent the -- they -- they sent the police to his house. He goes to the mother's house, he leaves the mother's house. Now, the police come back to his house. And all the while all they're saying to you is [defendant] is at fault.

There's a problem here. The problem isn't [defendant]. He didn't make his son leave her house. He didn't make her son not want to go there. If the 14-year old wanted to go there he would have went there. Nobody's -- he's not in a cage. He's a --

[(Emphasis added).]

At this point, the judge interrupted defense counsel to advise both attorneys that he had received that day a "case blurbs from the bar association" concerning an unpublished opinion from this court. According to the judge, in this non-precedential decision this court reversed the Family Part for failing to interview a fifteen-year-old child in a matter involving a change of custody application. The judge conceded that he did not have the full opinion, but immediately thought of this case after reading the synopsis. To his credit, the judge candidly admitted that he had been reticent to interview

27                                          A-4030-12T2

Jeremy because he wanted to spare the child the emotional trauma associated with his parents' feud.

The judge continued:

> But it may have come to that point. Because we cannot have the situation continue here where there's police involvement, for reasons that I already alluded to. And then we have a request made that I should enter an order that there be an immediate arrest if there's non-compliance. That's not happening. I'll tell you that right now. There might be other sanctions first, monetary or otherwise, but they'll be no such order.
>
> So now here's what I'm wondering. You're right though why we're here. And I don't want to expand the reason why we're here. But it's clear to me that despite what I think on my best efforts to try to have the two of you come together it's not happening.
>
> So here's what we're going to do, the current order remains in full force and effect. It has to be obeyed. If either one of you want to file an application that includes specifically that we interview the child you may do so. Or if the two of you agree to that you may do so, but you're going to have [to] file a motion.
>
> I'd like the two of you, if you could, to take a look at the case. I'm going to try to get the case. . . . It's unreported, but it's [persuasive].
>
> . . . .
>
> PLAINTIFF'S COUNSEL: But someone has to file the application, Your Honor.
>
> THE COURT: Right. I'm not doing it -- no.

PLAINTIFF'S COUNSEL: Okay.

. . . .

THE COURT: No, no. I'm not doing it on my own motion. Maybe you can -- you -- I still -- let me try one other -- one other approach, and I know at one time we discussed this, mediation. Is mediation out of the question?

Defendant's counsel indicated his client was "open to mediation"; plaintiff herself made clear she was not. Following plaintiff's unequivocal rejection, defense counsel indicated his client was equally unwilling to submit to this alternative process. Despite the judge's best efforts to convince them to change their minds, they remained committed to their position not to mediate.

V

Defendant's Motion for Reconsideration

On January 31, 2013, defendant filed a motion requesting the court to: (1) reconsider the January 10, 2013 order; (2) grant defendant primary residential custody of Jeremy; (3) order the parties to submit to mediation; (4) interview Jeremy; (5) reinstate the parenting time that prevailed from September 2012 to the end of 2012; and (6) modify defendant's child support obligation commensurate with his status as a parent with primary residential custody.

Defendant's motion came before the trial judge on March 18, 2013. The attorneys recounted the tortured procedural history of the case, and continued to make unsupported factual allegations. Conspicuously missing from this exchange is any reference to legal authority supporting or undermining the arguments advanced by either side. No statute, court rule, or case law was cited. At the conclusion, the judge again reaffirmed his previous order and declined to interview Jeremy.

VI

Legal Analysis

Against this record, defendant now appeals, arguing the trial judge erred in failing to order the parties to submit to mediation as required under Rule 5:8-1, and failing to consider and apply the factors outlined in N.J.S.A. 9:3-4 before reaching a final decision on who should be Jeremy's primary residential custodial parent.

We start our legal analysis by reaffirming that "the best interests of the child" is the fundamental legal principle that will guide our review of this case. Kinsella v. Kinsella, 150 N.J. 276, 317-18 (1997). This overarching consideration - "best interests of the child" - was defined by our Supreme Court nearly fifty-nine years ago as a paramount judicial responsibility to consider and safeguard "the safety, happiness,

physical, mental and moral welfare of the child." Fantony v. Fantony, 21 N.J. 525, 536 (1956). The Legislature has also adopted the "best interests of the child" standard as a matter of public policy. See N.J.S.A. 9:2-4.

Determining what custodial arrangement is in the best interest of a child requires the Family Part judge to apply the statutory factors outlined in N.J.S.A. 9:2-4, as complimented by the relevant court rules governing an award or change of custody, and reach a conclusion that is supported by the material factual record. "Absent exigent circumstances, changes in custody should not be ordered without a full plenary hearing." Faucett v. Vasquez, 411 N.J. Super. 108, 119 (2009), certif. denied, 203 N.J. 435 (2010) (citing R. 5:8-6).

Our Supreme Court has noted that, as a general proposition, we should accord great deference to discretionary decisions made by Family Part judges, provided they are supported by adequate, substantial, and credible evidence in the record. Cesare v. Cesare, 154 N.J. 394, 411-13 (1998). A proper exercise of judicial discretionary authority "connotes conscientious judgment, not arbitrary action; it takes into account the law and the particular circumstances of the case before the court." Higgins v. Polk, 14 N.J. 490, 493 (1954).

Here, our extensive examination of the record developed before the Family Part over three separate hearings did not reveal any instance in which the trial judge applied, considered, or even mentioned any of the relevant statutory and regulatory standards to determine whether a change in residential custody was in the best interest of this then fourteen-year-old boy. The Family Part's unexplained departure from the established policies governing change of custody applications leaves us with no other alternative but to remand this matter for the court to consider and apply the required procedural guidelines.

## A

## Mediation

With respect to mediation, Rule 5:8-1 makes clear that "[i]n family actions in which the court finds that either the custody of children or parenting time issues, or both, are a genuine and substantial issue, the court shall refer the case to mediation in accordance with the provisions of [Rule] 1:40-5." (Emphasis added). In order to provide a reasonable and meaningful opportunity for mediation to succeed, the trial court should confer with counsel and thereafter enter a case management order: (1) identifying the issues the mediator should address to resolve the parties' custodial dispute; and (2)

setting an initial two-month deadline to report back as required under Rule 5:8-1, with the proviso that this time period can be extended "on good cause shown." Ibid. Although the parties are not required to present expert opinion testimony during the mediation process, they are free to agree otherwise. Ibid. In short, the court must give the parties and the mediator all rights conferred under Rule 5:8-1.

The case management order must also include a clear and definitive date for ending the mediation process. Ibid. The trial judge is ultimately responsible for the progress of any litigation. The judge thus remains in control of the case at all times, and must guard against either party abusing the mediation process by treating it as tactic to delay, frustrate, or otherwise undermine the custodial or parenting time rights of the adverse party.

Given the parties' acrimonious relationship, as reflected in the manner they have behaved throughout this litigation, it appears to us unlikely that mediation will be successful. However, a professionally trained mediator is capable of creating an environment that fosters compromise over intransigence, enabling these litigants to subordinate their emotionally-driven personal interests to the higher needs of their teenaged son to have both of his parents involved in his

<u>life</u>. That being said, when the mediation process fails to reach a <u>timely</u> acceptable outcome, the court needs to quickly and decisively reassert its authority over the case.

<u>B</u>

<u>Plenary Hearing</u>

The record we have described here in great detail illustrates the parties have asserted what the judge correctly characterized as "diametrically" opposing positions regarding what type of custodial arrangement would be in the best interest of their now sixteen-year-old son. Plaintiff claims defendant's home life has been and continues to be dominated by domestic violence, which places her son in a physical danger and creates an emotionally chaotic home environment, rendering defendant utterly ill-suited to be Jeremy's residential custodial parent.

Defendant has refuted these allegations and claims plaintiff's overly confrontational, needlessly punitive parenting style has alienated Jeremy from his mother to such an extent that the teenager is not willing to reside with her. As an example of plaintiff's alleged inappropriate parenting-behavior, defendant "told" the trial judge that plaintiff has at times used excessive corporal punishment to discipline Jeremy. According to defendant, Jeremy's age and level of maturation has reached a point that it would be physically futile and

emotionally counterproductive to force him to live with his mother by judicial decree.

Given the parties' allegations, and to assist the trial judge in reaching the exquisitely difficult decision concerning what kind of residential custodial arrangement would be in Jeremy's best interest, we strongly suggest the court consider appointing an independent mental health professional to evaluate the current psychological and emotional state of Jeremy and his parents. Rule 5:3-3(b) provides the trial judge with the discretionary authority to appoint a mental health expert to perform parenting/custody evaluations of the parties and Jeremy. The mental health expert appointed by the court is mandated to conduct a "strictly non-partisan" evaluation to opine what would be in the child's best interests. Ibid. Such an evaluation "should consider and include reference to criteria set forth in N.J.S.A. 9:2-4, as well as any other information or factors they believe pertinent to each case." Ibid.

We conclude our discussion of this issue by cautioning the trial court that reports by mental health care experts may at times include the expert's opinion or recommendation to the court on the ultimate question of custody. These experts may also believe, or outright express in their reports, that their professional training and experience gives them unique insights

into the dynamics of troubled families, and they may urge the court to adopt their recommendations or at least defer to their professional judgments on the issue of custody and/or parenting time. Although the opinions of mental health practitioners or of any other professionals in the various fields related to the human psyche should be carefully considered by a judge when appropriate, such opinions do not relieve the trial judge from the ultimate responsibility of determining what type of custody arrangement is in the best interest of the child. The burden of making and explaining that decision remains at all times the exclusive obligation of the trial judge and can never be delegated to any other party. See Mackowski v. Mackowski, 317 N.J. Super. 8, 13 (App. Div. 1998) ("Ceding fact-finding responsibility to another party dilutes our ability, as judges, to decide issues based on the 'best evidence' [of the child] available.").

## C

### Interviewing Jeremy

The record here shows that at various times during the multiple hearings conducted by the trial judge both the parties and attorneys made allegations, proffers, and representations describing Jeremy's emotional state concerning his various interactions with the parties and their respective spouse and/or

"significant other."  The central figure in this family drama is unquestionably this now sixteen-year-old juvenile.  Both parties made glowing representations to the trial judge about his intellectual attributes, his academic prowess, and his emotional maturity.  Unfortunately, both sides have also claimed Jeremy has been significantly harmed while in the physical custody of the other parent, and will be exposed to even greater harm if forced by the court to reside with the other parent.

In our view, the discretionary authority conferred to the trial judge under Rule 5:8-6 was precisely intended to be exercised in cases such as this one.  We recognize a previous version of Rule 5:8-6 provided that "the [trial] court shall . . . at the request of a litigant conduct an interview with the child(ren) if the child(ren) are age 7 or older."  Mackowski, supra, 317 N.J. Super. at 11 (emphasis added).  We also acknowledge that at the recommendation of the Family Practice Committee and based, in part, on the reasoning expressed by our colleague Judge Kestin in his concurring opinion in Mackowski,[4]

---

[4]  Judge Kestin noted:

> I believe that child interviews in custody cases are unwise because they are harmful to the child, often irreparably so, with no significant offsetting benefit; and they impact in subtle and potentially destructive ways on parent-child relationships.  Once a

(continued)

A-4030-12T2

the Supreme Court amended <u>Rule</u> 5:8-6, effective September 3, 2002. The rule now reads as follows:

> Where the court finds that the custody of children is a genuine and substantial issue, the court shall set a hearing date no later than six months after the last responsive pleading. The court may, in order to protect the best interests of the children, conduct the custody hearing in a family action prior to a final hearing of the entire family action. <u>As part of the custody hearing, the court may on its own motion or at the request of a litigant conduct an in camera interview with the child(ren)</u>. In the absence of good cause, the decision to conduct an interview shall be made before trial. If the court elects not to conduct an interview, it shall place its reasons on the record. If the court elects to conduct an interview, it shall afford counsel the opportunity to submit questions for the court's use during the interview and shall place on the record its reasons for not asking any question thus submitted. A stenographic or recorded record shall be made of each interview in its entirety. Transcripts thereof shall be provided to counsel and the parties upon request and payment for the cost. However,

---

(continued)

> judge, as decision maker, conducts an interview with a child when the pending question is custody, nothing the judge or any other person can say or do will ever convince the child that he or she is not responsible for the ultimate decision that is made. This is a burden no child, of any age, should ever carry; it is one that may weigh heavily for years to come.
>
> [<u>Mackowski</u>, <u>supra</u>, 317 <u>N.J. Super.</u> at 15 (Kestin, J., concurring).]

38

> neither parent shall discuss nor reveal the contents of the interview with the children or third parties without permission of the court. Counsel shall have the right to provide the transcript or its contents to any expert retained on the issue of custody. Any judgment or order pursuant to this hearing shall be treated as a final judgment or order for custody.
>
> [Rule 5:8-6 (emphasis added).]

By replacing the word "shall" in the pre-2002 version of the Rule with the word "may," the Supreme Court made clear that the decision whether to interview a child in a contested custody case is left to the sound discretion of the trial judge, which, as in all matters affecting children, must be guided by the best interest of the child. The Rule also provides that "in the absence of good cause," the trial judge should decide whether to interview the child before the start of the trial.[5] Ibid.

Of particular relevance here, Rule 5:8-6 also contains equally clear, non-discretionary mandates:

> If the court elects not to conduct an interview, it shall place its reasons on the record. If the court elects to conduct an interview, it shall afford counsel the opportunity to submit questions for the court's use during the interview and shall

---

[5] Although Rule 5:8-6 uses the word "trial," we discern no rational basis for not applying the Rule to an evidentiary hearing in cases such as this one, where the parties are contesting the custody of their child in a non-matrimonial dissolution setting.

> place on the record its reasons for not asking any question thus submitted.

> [(Emphasis added).]

Without belaboring the point, the record developed before the trial court shows no effort by the trial judge to comply with these requirements. Although the Rule also directs that a certain protocol be followed if the judge decides to interview the child, these issues are not relevant here because the judge's ambivalence about whether to interview Jeremy left us without a reviewable record on the vital threshold issues.

In the interest of providing the Family Part with some guidance on how to address the difficult discretionary decision of whether to interview a child, we suggest our colleague at the trial level consider the following words written by Judge Carchman in <u>Mackowski</u> over sixteen years ago:

> We appreciate the concern expressed by the judge that by compelling [this sixteen-year-old girl] to submit to an interview, the judge was compromising her loyalty to both parents by requiring her to "choose between the two." While such a view may have surface allure, in reality, it is both too narrow and, ultimately, unfair to the child. In making a determination as to an award of custody, or in this case a change in custody, a judge is charged with considering the factors set forth in <u>N.J.S.A.</u> 9:2-4, including an assessment of "the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision." <u>The proper assessment of a child's ability to</u>

<u>participate in the decision-making process, a right protected by statute, cannot be performed by a simple reading of an affidavit or letter from the child.</u> We do not countenance such decision-making where there are contested issues requiring a plenary hearing, and we cannot accept the denial of a hearing premised on a notion or hope that such denial is protecting the child. <u>The child has a right to be heard and voice an opinion to the finder of fact and ultimate decision-maker. The court need not be bound by the child's view but that cannot be a basis for denying the child the right to express a view if he or she chooses to do so</u>.

We recognize that some judges prefer not to be involved in a process which can be uncomfortable for both the judge and the child. That, however, provides no justification for abrogating the responsibility to perform a function mandated by our rules[6] of court and necessary to fulfill a statutory duty. The concern that judges are ill-equipped to conduct such interviews speaks to the need for enhanced judicial training. <u>A carefully conceived and conducted interview can produce facts, including, among other things, information about interests, activities with parents, living arrangements and friends, that may be dispositive and at no time require that the child be confronted with the ultimate question requiring that an election between parents be made</u>. We agree that no child should be asked to select between two opposing parents, and <u>R.</u> 5:8-6 does not speak in such stark terms. In this case, [the child] was sixteen years old, less than two years from majority. She filed a letter with the court expressing her

---

[6] Obviously, the September 2002 amendment to the Rule no longer makes this mandatory. We nevertheless strongly subscribe to the wisdom permeating Judge Carchman's words.

preference for living with her father. An interview was necessary to allow the judge to carefully test the bona fides of [the child]'s alleged choice.

[Mackowski, supra, 317 N.J. Super. at 12-13 (emphasis added) (footnotes omitted).]

As we noted earlier, the amendment to Rule 5:8-6 making the decision to interview a child in a custody dispute discretionary by the judge came to past in part by recommendations made by the Family Practice Committee. Pressler & Verniero, Current N.J. Court Rules, comments on R. 5:8-6 (2015). The report of the Family Practice Committee included the recommendations of the Custody and Parenting Time Subcommittee that formed, at least in part, the basis for amendments to Rule 5:8-6 adopted by the Supreme Court in 2002. The Subcommittee's report emphasized and contrasted the Rule's then inflexible command for the trial judge to interview a child who was at least seven years old, with the more balanced and sensitive approach endorsed by the Legislature in N.J.S.A. 9:2-4.

This criticism of the Rule's inflexibility before the 2002 amendment was well-founded. By contrast, the preamble to N.J.S.A. 9:2-4 describes the public policy underpinning its requirements and strikes the proper balance to guide the court in its implementation:

The Legislature finds and declares that it is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have separated or dissolved their marriage and that it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy.

Towards that end, N.J.S.A. 9:2-4(c) provides:

In making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children. A parent shall not be deemed unfit unless the parents' conduct has a substantial adverse effect on the child.

[(Emphasis added).]

This statute identifies the key elements the Family Part Judge must address when confronted with the awesome

A-4030-12T2

responsibility of deciding who should have custody of the child. The Supreme Court has made clear that "in all custody determinations, the preference of the children of 'sufficient age and capacity' must be accorded 'due weight.'" Beck v. Beck, 86 N.J. 480, 501 (1981). Given Jeremy's age, alleged emotional maturity, and level of intelligence, the trial judge here was clearly required to take into consideration Jeremy's feelings and desires concerning where and with whom he should live. At the very least, Rule 5:8-6 required the judge to place on the record his reasons for not interviewing this fourteen-year-old boy. Peregoy v. Peregoy, 358 N.J. Super. 179, 206 (App. Div. 2003).

If the judge elects to interview Jeremy, (as the prevailing circumstances here strongly indicate he should), Rule 5:8-6 mandates the court to: (1) conduct an interview with the child in camera[7]; (2) "afford counsel the opportunity to submit questions for the court's use during the interview"; (2) "place on the record its reasons for not asking any question thus submitted"; (3) create and preserve a stenographic or recorded

--------

[7] "The interview occurs in camera because the child is entitled to a degree of privacy which preserves, so far as possible, the child's 'freedom of expression.'" Uherek v. Sathe, 391 N.J. Super. 164, 168 (App. Div.), certif. denied, 192 N.J. 72 (2007) (quoting Lavene v. Lavene, 148 N.J. Super. 267, 272 (App. Div. 1977)).

audio record of each interview in its entirety; and (4) provide transcripts of the interview(s) to counsel and the parties[8] upon request and payment for the cost.  <u>Ibid.</u>

The court should also ensure and make clear that "neither parent" is permitted "to discuss nor reveal the contents of the interview with the children or third parties without permission of the court."  <u>Ibid.</u>  We recommend the court enter a case management order to memorialize this particularly important aspect of the interview process.  This order must make clear that any violation of this confidentiality provision may expose the responsible individual to sanctions pursuant to either a motion to enforce litigant's rights brought by a party under <u>Rule</u> 1:10-3, or Summary Contempt Proceedings initiated by an Order to Show Cause under <u>Rule</u> 1:10-2.

We sympathize with the trial judge's consternation and share his concern for the emotional trauma Jeremy may experience during the interview process.  <u>N.J.S.A.</u> 9:2-4(c) does <u>not</u> require the judge to ask a child to select between two opposing

---

[8] We emphasize, however, that the mandate in <u>Rule</u> 5:8-6 to provide transcripts of the court's interview with a child to counsel and the parties applies only <u>to an actively pending contested custody case</u>.  In the interest of clarity, we reaffirm our holding in <u>Uherek</u>, <u>supra</u>, that "absent that circumstance," there is no legal basis for the turnover of the child's private communications with the court, not "even to a parent."  <u>Id.</u> at 169.

parents. The statute only requires the judge to consider the child's "preference," when he or she is "of sufficient age and capacity to reason so as to form an intelligent decision[.]" In going about this exquisitely delicate task, we strongly suggest trial judges to keep in mind Judge Carchman's wise observations in Mackowski:

> Too often, judges deciding issues in the Family Part must rely solely on the "voices" of the attorneys who prepare the competing affidavits and certifications on the pretense that the litigant is speaking. [The judge's interview] insures that where custody is a "genuine and substantial" issue, the judge will not be insulated from seeing and hearing the subject of the dispute. The "voice" seen and heard will not be that of the lawyer or litigant but that of the child who is the subject of the dispute. The value of a properly conducted interview enabling the judge to see and hear the child first-hand outweighs the possibility of harm that may befall a child by being subjected to the interview process. On balance, it is not the interview that is ultimately harmful, but the custody dispute between the parties that potentially wreaks havoc with the child.
>
> [Mackowski, supra, 317 N.J. Super. at 14].

The Supreme Court has recognized that Family Part judges have developed a special expertise in dealing with family and family-type matters. Cesare, supra, 154 N.J. at 412-13. We have complete confidence that this judge, indeed all of the judges assigned to the Family Part, will strive to conduct the difficult

46

task of interviewing children in contested custody cases with dignity, compassion, and great sensitivity to the extraordinary circumstances that have brought this child before the court.

VII

Conclusion

The record shows the trial judge was unaware that under Rule 5:8-1 he was obligated to refer this case to mediation because Jeremy's custody and parenting time were genuine and substantial issues in dispute. We are therefore compelled to remand this case for the parties to submit to mediation. The record also reveals that the parties have been heretofore utterly unwilling to subordinate their antipathy for each other and reach a compromise position that would be in the best interest of their now sixteen-year-old son.

We thus strongly suggest the trial court closely monitor the mediation process by way of periodic reports from the mediator. Unless the court is satisfied that the mediation process is producing meaningful and measurable progress, the court should reassert jurisdiction and schedule a plenary hearing forthwith. On this point, we are compelled to note that the informality that permeated all of the court's interactions with the parties and their respective attorneys here were not only unproductive, but ultimately undermined the solemnity and

decorum necessary for effective courtroom management. We reaffirm the standard we articulated twelve years ago:

> Trial judges are given wide discretion in exercising control over their courtrooms. However, the trial judge has the ultimate responsibility of conducting adjudicative proceedings in a manner that complies with required formality in the taking of evidence and the rendering of findings.
>
> . . . .
>
> [F]actual findings must be supported by evidence admitted during the hearing, which shall be held on the record. All documentary exhibits considered by the court must be clearly identified for appellate review. R. 1:2-3. Testimonial evidence must be presented through witnesses who are under oath, N.J.R.E. 603, and subject to cross-examination. N.J.R.E. 611.
>
> [N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 264-65 (App. Div. 2002) (internal citations omitted).]

Here, the parties' dramatically different and conflicting factual accounts need to be carefully scrutinized by the professionally trained eyes of an experienced Family Part Judge, but only after both parties have been subjected to aggressive cross-examination, the best tool we know for clearing up obscurity, minimizing hyperbole, and revealing truth.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION