**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3793-17T2

V.P.,

     Plaintiff-Appellant,

v.

P.A.P.,

     Defendant-Respondent.

_____

           Argued December 19, 2018 – Decided December 13, 2019

           Before Judges Fuentes, Vernoia and Moynihan.

           On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0606-17.

           Andrew M. Shaw argued the cause for appellant (The DeTommaso Law Group, LLC, attorneys; Andrew M. Shaw, on the briefs).

           Joseph DiRienzo argued the cause for respondent (DiRienzo & DiRienzo, PA, attorneys; Joseph DiRienzo, on the brief).

     The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant appeals from a post-judgment order entered by the Chancery Division, Family Part that modified the terms of the parenting time arrangement the parties agreed to and memorialized in a Marital Settlement Agreement (MSA). We reverse and remand for the Family Part to conduct a plenary hearing to determine if a change in residential custody and/or modification of the existing parenting arrangement is in the best interest of the parties' two teenaged daughters.

I

Plaintiff V.P. (Victoria) and defendant P.A.P. (Peter)[1] were married in October 2003. They had two daughters, K.D.P. (Kadance), who is now sixteen years old, and H.A.P. (Heather), who is now thirteen. The parties separated in 2016. Each party retained private counsel and negotiated the terms of the MSA they signed on June 16, 2016. The MSA contains 108 numbered paragraphs that comprehensively address and resolve all the issues associated with the dissolution of the marriage.

---

[1] Pursuant to Rule 1:38-3(d), records of proceedings before the Chancery Division, Family Part are confidential. We use pseudonyms to protect the privacy of the litigants and preserve the confidentiality of these proceedings.

2

Under Paragraph 7, both parents have "legal custody" of the children and must discuss and agree on "all matters relating to the health (including psychological and psychiatric) welfare, religious training, education, activities, camp, and other issues of similar importance affecting the children . . . [.]" Any agreements reached by the parties related to these matters "shall be confirmed in writing in an email with the Husband and the Wife expressing their consent to the agreement. In the event [they] are unable to agree . . . neither [party] shall act unilaterally."

Before the October 25, 2016 amendments to the MSA, Paragraph 19, denoted "Parenting Time Schedules," provided defendant with "regular parenting time with the children based on a five[-]week repeating schedule[.]" This was illustrated in a graph and was expected to work "for all future years and the [defendant] and the [plaintiff] shall work together to agree upon the specific dates in the future."

The parties also provided a self-executing, nonjudgmental remedy to be used when a parent, for whatever reason, did not have parenting time with the children for more than ten days. Under Paragraph 19 in the original MSA, in the event either parent "does not have parenting time with the children for ten (10) consecutive days, that parent shall have a right to a midweek dinner from 5:00 p.m. to 8:00 p.m., with the specific date to be agreed upon."

3

On October 25, 2016, the parties amended the MSA and "replaced" several parts of the agreement "in their entirety." Our focus here is limited to the amendments that touched upon parenting time. The amendment replaced "Paragraphs 19 and 20[2]. . . in their entirety" with a new Paragraph 19 denoted "Parenting Time Schedules." Starting on Tuesday July 5, 2016, the amended arrangement provided defendant "regular parenting time with the children based on a three (3) week repeating cycle, which begins on a Monday and ends with a Sunday."

The amended Paragraph 20 provides a parenting time schedule for holidays and special events. The time the children spend with defendant during these events "are periods of time that take precedence, but do not break the continuity of the parenting [time] schedule set forth" under the amended Paragraph 19. This arrangement covers holidays and special events "for 2016, 2017 and thereafter on a year to year basis." The parties once again included a chart to illustrate how they expected this parenting time and holiday/special-events schedule would work. The last parenting time item involved vacations.

---

[2] Although Paragraph 21 states that "the parenting time set forth in [P]aragraph 20 above shall take precedence over the regular parenting time set forth in [P]aragraph 19," the copy of the MSA provided to us in the appellate record does not have a Paragraph 20.

A-3793-17T2

Once again, the parties methodically established a comprehensive protocol designed to manage this aspect of the children's interactions with a parent.

On November 14, 2017, the Family Part entered a Dual Final Judgment of Divorce (JOD) formally dissolving the marriage and expressly incorporating the amended MSA as part of the court's decree. On March 27, 2018, less than five months after the court issued the JOD, defendant filed a notice of Motion to Enforce Litigant's Rights seeking seventeen specifically enumerated items of relief that would materially alter, if not outright eradicate, the carefully negotiated provisions in the MSA related to the children's residential custody and parenting time. For example, defendant sought an order from the court: (1) "immediately" awarding him residential custody of the children pending a plenary hearing; (2) restricting plaintiff's contact with the children to "a supervised setting," until otherwise ordered by the court; (3) directing "[p]laintiff to undergo a psychiatric evaluation"; and (4) requiring plaintiff's adherence to "any recommendations" made by the psychiatrist, and "cooperat[ion] with a custody evaluation."

Defendant's remaining prayers for relief involved the imposition of some form of sanction against plaintiff based on her alleged violations of the MSA. In support of this extraordinary application, defendant averred plaintiff "deliberately" engaged in conduct designed to alienate the children's affections

5

for him; she attempted to thwart his "ability to attend events, meetings, and medical appointments for the children" and "unilaterally" scheduled his younger daughter "in a new full-year competitive cheer program . . . that dramatically interfered with [his] parenting time. . . [.]" Defendant also claimed plaintiff refused to take the children to Hebrew School or follow a physician's alleged "therapeutic recommendations[.]"

In the event the court were to deny his request to transfer residential custody of the children to him immediately, defendant requested he be awarded "make-up parenting time to begin immediately and continue until all make-up overnights have occurred[.]" Defendant petitioned the court to sanction plaintiff $1000 "per day for each day she fails to produce the children for parenting time" and for each therapeutic session missed by the children. Finally, defendant asked the judge to interview the children directly. If this interview reveals the children have "knowledge of this litigation," the judge should order that plaintiff's contact with the children be "supervised at all times."

In support of this motion, defendant submitted a certification replete with accounts of plaintiff's alleged misconduct with the children. Most of defendant's allegations of plaintiff's misconduct predate the November 14, 2017 JOD.[3] The

---

[3] We also note that the law firm that filed this motion on defendant's behalf is the same firm that represented defendant in the matrimonial proceedings.

6

few accounts of plaintiff's alleged misbehavior, which occurred after the November 14, 2017 JOD, can be characterized as minor or petty. For example, defendant averred that plaintiff:

> encouraged the children to alienate [his] side of the family, as well. To make a long story short, [Kadance's] Bat Mitzvah was a nightmare. Plaintiff had [Kadance] "un[-]invite" me and my family to her party. Ultimately, I was re-invited but was limited to only a handful of guests. When I gave [p]laintiff my list of 25 people from my side of the family, she responded that they already had 68 invites and the venue was for 70.

Defendant did not seek emergent relief from the Family Part in his Notice of Motion to Enforce Litigant's Rights dated March 27, 2018. In fact, the motion indicated a return date of April 20, 2018.

II

On April 1, 2018, defendant filed an Order to Show Cause (OTSC) substantially seeking the same relief he sought in the March 27, 2018 motion. Defendant and his attorney appeared before the Family Part on April 2, 2018 for a hearing on the OTSC. Neither plaintiff nor her attorney were present at this hearing. As the following interactions show, the judge initially treated this matter as an ex parte application.

> THE COURT: All right. This is . . . defendant's Order to Show Cause. And he has submitted in . . . support of that a Letter Brief with a Certification consisting of 15 pages, 31 paragraphs, with a number of different

7

attachments. Apparently this is an ongoing problem that [plaintiff] . . . is not allowing him access to the two children, [Kadance], age 13, and [Heather], age 11. It has been going on for some time. There was . . . another appearance . . . just about a year ago it flared up.

THE COURT: Tell me, . . . [addressing defendant] in your own words, what has happened in the last year.

. . . .

How . . . often have you seen your children?

DEFENDANT: Well, . . . in the last - - I guess, it's almost about three months, I - - the only time I've had them would be on two separate occasions. I had dinner with them at a public restaurant. That was [plaintiff's] insistence. And she sat in the parking lot and waited for them. So it was like an hour.

. . . I'm supposed to get them, pretty much, two weekends out of three from - -

THE COURT: There's no . . . requirement for any supervised visitation. Is that . . . correct?

. . . .

DEFENSE COUNSEL: No, sir. No, Your Honor.

At this point in the proceeding, the court clerk informed the judge that plaintiff's counsel had contacted the court and asked to participate telephonically. In the colloquy that ensued telephonically, plaintiff's counsel alleged she only received part of defendant's OTSC late in the evening of the previous day. Defendant's counsel refuted these allegations.

8

Despite the disputed accounts related to service of process, the judge ultimately found the relief sought in the OTSC were "essentially the same" relief defendant sought in the motion filed on March 27, 2018.  At this point, the judge told plaintiff's counsel that prior to her telephonic appearance, defendant testified under oath that "he has not been getting his children."  The judge then addressed defendant directly as follows:

> THE COURT:  I want specifics as to what dates you were supposed to get them and - - and when was the last time you saw them.  You started to tell me about a – a restaurant.  Is that correct?
>
> DEFENDANT:  Yes, Your Honor.
>
> THE COURT: When was . . . the last time you had dinner with them?
>
> DEFENDANT: Well, I had dinner with them last Friday at Buffalo Wild Wings.  This - - this last Friday.
>
> THE COURT: All right.  And when were you supposed to have them for the weekends?
>
> DEFENDANT: Well, this weekend is a little bit of an –
>
> DEFENSE COUNSEL: Go back to January.
>
> DEFENDANT: Yeah.  I - - I mean, if - - if I go all the - - basically, the - - the schedule is as defined in the - - in the MSA.
>
>         . . . .
>
> Two - - two weekends out of three.

9

. . . .

THE COURT: Okay. How many have you gotten since January 1st?

DEFENDANT: [S]ince January - - I - - going from January 20th onward, I haven't had any.

Defendant also testified that he did not see his daughters on President's Day weekend and other days specifically identified in the MSA. According to defendant, he had missed thirty-six parenting time days since January 20, 2018. In response to the judge's question, defendant provided the following explanation in support of his claim:

> I had pleaded with my ex-wife on numerous occasions. And she basically has refused to even - - directly even address me. She puts the two girls on the - - she has them contact me and say we're not coming. This . . . happened over and over again, and at which point I said, that - - that can't - - that's obviously more hurtful than anything else. So going forward I said, don't do that. That's obviously not a good way to handle this, my two - - you know, 11 and 13 year old daughters telling me that they don't have to come if they don't want to. So . . . thereafter I would send her e-mails. I'd try to call her. She won't answer the phone.
>
> I actually had gone to the police. The police called her on a number of occasions[.] [S]he doesn't answer the phone in some circumstances when the police call her.
>
> And I send her e-mails . . . a lot of times she doesn't answer. When she does answer she says, the kids don't want to come. It's your problem to solve. You . . . better figure something out. And she sent me . . . a

10

picture of a book on good parenting, all that kind of
stuff.  That . . . [is] her answer.

Defense counsel cited to a statement made by the judge who presided over

the matrimonial litigation which cautioned the parties that "kids don't make the

decisions[.]"  According to defendant's counsel, "things got back on track

immediately following the hearing.  He was able to see his children."  Defense

counsel also apprised the judge that previous attempts to address the problem

through mediation proved to be ineffectual.  A Consent Order dated June 2, 2017

memorialized the parties' agreement:

> The parties agree that they will immediately commence
> co-parenting counseling and family therapy with Dr.
> Timothy Hamway. The parties agree that they will both
> participate in co-parenting counseling and family
> therapy with Dr. Hamway and that both of their
> children will also participate in family therapy. The
> parties shall follow Dr. Hamway's recommendation and
> protocol as to the participants for each session, the
> frequency/duration of the sessions, etc.
>
> The parties agree that they will abide by the reasonable
> recommendations of Dr. Hamway. They also agree that
> Dr. Hamway shall be authorized to communicate with
> the children's therapists. The parties further agree that
> they both expressly authorize Dr. Hamway to report to
> and communicate to the [c]ourt upon request of either
> party or their counsel.

Despite these efforts, defense counsel claimed: "We're literally in the

same place at the same time as we were last year.  Only now the harm is so much

11

more. Last year, I think he lost 24 days of parenting time. Now we're talking about 36."

Plaintiff's counsel prefaced her response by noting that she did not represent plaintiff the previous year. She also noted that the remarks defense counsel attributed to a previous judge, ("kids don't make the decisions"), were made in the context of a motion hearing in which no testimony was taken. That judge appointed the therapist who remains involved with the family. According to plaintiff's counsel, the steps her client took with respect to the children were in accordance with the therapist's recommendations. According to plaintiff's counsel, the parties were scheduled to attend a therapy session with the therapist that night.

Plaintiff's counsel characterized the situation with the children as the symptoms of "a deteriorated relationship between dad and these girls." She apprised the court that plaintiff intended to file a cross-motion "seeking much of the same relief that [defendant] seeks. Maybe we need experts. Maybe we need a custody evaluation. I'm sure everybody loathes that. There's an issue here that needs to be solved. Nobody is disputing that." Plaintiff's counsel thus asked the judge to afford her the opportunity to respond to defendant's allegations in writing to provide the court with a balanced presentation of the facts.

12

The judge made the following comments at the conclusion of the hearing:

> THE COURT: Well, here's what I see. I see a Court Order not being followed. Dr. Hamway is not going to tell me what . . . to do with . . . an Order. They can make -- a doctor can make a recommendation. Your client is –
>
> PLAINTIFF'S COUNSEL: Sure.
>
> THE COURT: -- not going to tell me, nor is [defendant]. All right. This is what I'm ordering. And I'm very, very -- you can tell your client I'm very close to changing custody. This cannot go on.
>
>      . . . .
>
> . . . I want everybody here at 8:30 tomorrow morning. I don't want any excuses. I don't want to hear about trial schedules or anything else. I'm going to make a decision on this tomorrow. We may change custody. I don't know if I'm going to do that or not. I have to see what's in the best interest of the children. But we're not going to have another year of somebody violating Court Orders. It's as simple as that.

The court reconvened the following day. The parties were the only witnesses; they were sworn in at the commencement of the hearing. The transcript of the April 3, 2018 hearing shows the judge questioned the parties in a haphazard fashion, going back and forth between them. The lawyers intervened at will in this "conversational" format and supplemented or rephrased their client's testimony. The judge acquiesced to these irregularities and actively encouraged this approach. The following exchange illustrates the problem:

13

DEFENSE COUNSEL: Okay. Telephone contact. Just kind of goes to his lack of -- of contact with the children. Mom doesn't facilitate any telephone contact. He calls -- and this is, again, certified to in his Certification. He calls and texts them and doesn't get returned calls.

THE COURT: Do they -- the girls have cell phones?

PLAINTIFF: Yes.

DEFENDANT: Yes. I got –

DEFENSE COUNSEL: Yes.

DEFENDANT: I paid for them.

THE COURT: Who do you text[?]

DEFENDANT: Both - - both daughters.

THE COURT: And they've not [returned] your texts?

DEFENDANT: Usually not.

THE COURT: Do they return your phone calls?

DEFENDANT: No.  Almost never.

THE COURT: Yesterday there [was] testimony . . . the last visit you had with your children was when? . . .

DEFENDANT: Last Friday I . . . took them to dinner, Buffalo Wild Wings, for an hour.

THE COURT: Where?

(Attorney Confers with Client)

14

DEFENDANT: [I]'m sorry. [Plaintiff] took them and waited in the parking lot, I think.

PLAINTIFF: No.

Plaintiff's counsel argued that "[t]his isn't a case of physical abuse. It's a case of allegations of emotional issues[.]" According to plaintiff's counsel, Dr. Hamway was not willing to participate in court proceedings or offer an opinion on how the court should decide the custody issue. The record shows the judge was sympathetic to plaintiff's counsel position and expressed his frustration with Dr. Hamway's unwillingness to provide the court with his opinion on this contentious matter.

THE COURT: I'm particularly bothered by the fact that we're getting second and third-hand snippets of Dr. Hamway. There are no Medical Reports. There's no Counseling Reports, no Psychology Reports, no School Reports. There's nothing that . . . tells me . . . that explains why the Court Order is not being followed.

At this point, plaintiff's counsel asked the judge to interview the children directly. The judge did not respond to plaintiff's counsel request or otherwise address this issue. The judge made clear, however, that he was prepared to enforce the parenting time approved by the court in the amended MSA and memorialized in the Consent Order "[b]ecause no 14 year old and no 12 year old [sic] . . . are going to drive this bus." At the conclusion of this hearing, the judge made the following statement:

15

These . . . are very difficult matters because it's difficult to raise children. And it's particularly difficult for divorced parents to raise children. And there's a fine line between alienation . . . by the parent of primary residence and children not just wanting to move from place to place and perhaps not be with their father. We're going to come up with some resolution today. Okay. Their relief is going to be granted.

At this point, the judge reviewed the public policy and statutory standards codified in N.J.S.A. 9:2-4, and addressed the parties as follows:

[T]he [L]egislature, when they came up with this enactment, which really follows hundreds of years of common law of religious tradition, of general morals and ethics in the communities over the years, did not talk about cheer,[4] did not talk about after school activities. Their obligation, these children, is to follow the Court Order.

If they lock themselves in their room, they lock themselves in their room. They do that at home. Children at home do that all over the world every day. They don't want to see a parent, they don't [want] to talk to a parent, they lock themselves in their room. That's simple when the parents are on the same page. You tell them, get out of the room, or you take away the phone, or they don't go to cheer, or you do something as a parent to discipline the children to make sure that they obey you.

They can . . . [defendant], I'm not going to drag them out of the room. If they go to your house three days in

---

[4] The judge's comment about "cheer" relates to a part of plaintiff's testimony in which she explained that the older girl was actively involved in cheerleading at school. The team participates in competitive activities on weekends, which at times conflict with her attendance in Hebrew School.

16

a row and they stay in their room with no cell phone, no TV, no music, that's their business. My guess is that at some point in time they'll come down to a -- to a communal area where they can use a phone, where they can watch TV, where they can listen to music, and have their friends over. It's just my guess. I don't know your children.[5]

The judge ordered the parties and their counsel to confer in a nearby room and develop a mutually acceptable schedule that would gradually require the girls to have overnight parenting time with defendant. The judge also ordered the attorneys to call him on a weekly basis to report how the reconfigured parenting time plan was working. The judge characterized this as akin to a "status conference call." He also made clear the goal was for defendant to have the girls overnight "within ten days" and "a full weekend" within twenty days.

Plaintiff's counsel also apprised the judge that the parties had agreed to retain a parenting coordinator with "binding authority pending any application before [the court]." This agreement would be implemented within ten days. Heather, the youngest daughter, would attend Hebrew School on Sundays.

---

[5] The judge also cited to <u>Beck v. Beck</u>, 86 N.J. 480, 499 (1981), in which the Supreme Court held that when recalcitrant parents act in a manner that "deprive the child of the kind of relationship with the other parent that is deemed to be in the child's best interests, removing the child from the custody of the uncooperative parent may well be appropriate as a remedy of last resort."

17

Kadance would continue to attend "confirmation academy[6] through [the] current session. And then the parties [would] reevaluate whether or not she's going to continue in the future." The parties also sought guidance from the judge on how to sanction the children if they were unwilling to cooperate with this modified parenting time arrangement. Defendant's counsel suggested the removal of their cellphones but expressed concern that the children would blame defendant.

The record shows the judge wanted to make clear to the children that these custodial arrangements were ordered by the court and would be enforced by the court.

> THE COURT: Okay. These kids want to blame somebody, they can come in here. And I'll -- and they'll hear me and I'll hear them.
>
> DEFENSE COUNSEL: Okay. But we also -- I guess what we were asking -- and I think the parties wanted to hear from Your Honor, if you had any further suggestions. Because the problem has been that the kids don't want to go to parenting time for whatever reason. So -- you know, [plaintiff], I think, is concerned. How do I get these kids to comply? And beyond the cell phone thing, I don't really know what else to do . . . to convince these kids –
>
> . . . .
>
> THE COURT: I want this . . . provision in the [Consent] Order. The children are directed to comply with this

---

[6] As explained by the parties, confirmation academy is an aspect of Hebrew School.

A-3793-17T2

Order. They will be subject to sanctions if they do not comply. Including loss of cell phone privileges, loss of internet privileges, loss of social media, loss of extracurricular activities, loss of travel.

DEFENSE COUNSEL: Okay. Thank you, Your Honor.

THE COURT: And I want the parents -- and -- you know, I can't -- I'm not there. I don't know how you're going to spin it to them. But I want them to realize this is . . . not coming from [defendant] or [plaintiff], this is coming from me. And I want direction in there at the [c]ourt's . . . own direction[7] that that is what I'm going to order.

The parties and counsel conferred as ordered and worked out a modified parenting time schedule that sketched out the material parts of the agreement in five handwritten pages. Plaintiff's counsel also described the details of the arrangement on the record. This modified agreement required the parents to attend a therapy session with Dr. Hamway "where they're both going to air out any of their disputes that they may have or their misunderstandings from Dr. Hamway. So Dr. Hamway can tell both of the parties together what his anticipation is for the ongoing sessions."

The parties did not submit a formal typewritten, fully executed consent order to the court. On April 4, 2018, the day following the hearing that produced

---

[7] Although the transcript reflects "direction," we believe the judge intended to say "discretion."

19

the handwritten parenting agreement, the court issued a sua sponte order directing the parties to appear on April 25, 2018 for a hearing. The caption of the order stated: "Failure to Submit Consent Order."

The parties did not appear before the judge on April 25, 2018 as ordered. Instead, the judge conducted an off-the-record telephone conference with defendant's counsel and plaintiff's recently retained substitute counsel. At the end of this impromptu telephone conference, the judge summarized on the record the discussions he had with counsel. A transcript dated April 25, 2018, contains the following prefatory comments from the judge:

> Neither the parties, nor their attorneys, are here. This morning at about 8:30, I had a conference call which lasted about 15 or 20 minutes with [defendant's counsel and the attorneys] representing . . . plaintiff. That call was not on the record. I told the parties that I would be putting certain findings and a recap of the call on the record this morning. They could order that if they wanted.
>
>     . . . .
>
> This is . . . essentially, a case where the defendant is alleging that the plaintiff has alienated the children against him.

According to the judge, plaintiff's substitute counsel suggested the court appoint Dr. Hamway as the "Reunification Therapist" because he was familiar with the parties' travail. The judge advised the attorneys that he was not willing

20

to take this action without: (1) hearing directly from Dr. Hamway; and (2) determining who was responsible for violating the agreement that was placed on the record on April 2, 2018.

Instead, in an order dated April 27, 2018, the judge appointed Dr. Marcy Pasternak "as the reunification therapist in this matter" and held the parties equally responsible for the cost of the reunification therapy, "without prejudice and subject to allocation." The judge also prohibited the attorneys from sending Dr. Pasternak "any correspondence, reports, notes or other documents . . . unless she requests the information." The judge ordered Dr. Hamway and Dr. Pasternak "to cooperate with one another," but made clear that the therapy reunification sessions with Dr. Pasternak had priority over "athletics, social functions, parenting time, and extracurricular activities." He also made plaintiff responsible for bringing the girls to the therapy sessions and prohibited the parents from texting or calling the girls "during reunification sessions." The judge specifically ordered plaintiff "not [to] wait outside during the reunification sessions."

The judge appointed attorney Amy Shimalla as Parenting Coordinator and made the parties equally responsible for the cost of Shimalla's services, "without prejudice and subject to allocation." The judge ordered Shimalla to prepare and submit for his review an order appointing her Parenting Coordinator by May 2,

21

2018 and directed the parties to sign Shimalla's retainer agreement by May 9, 2018. The judge directed that "[a]ll previous orders shall continue in full force and effect except to the extent modified by this Order." Finally, the judge made clear that the April 27, 2018 order "addresses the issues which were the subject of the consent order."

In the Statement of Reasons in support of his decision to enter this sua sponte order, the judge explained that he imposed this arrangement based on certain admissions made by plaintiff's counsel during the April 25, 2018 telephone conference. Specifically:

> The plaintiff, through counsel, does not deny the allegation that she travelled to the Kalahari Resort at the time [defendant] took his daughters to that resort. She admits, through her attorneys, that she exchanged over 160 text messages with their daughter [Heather] during the Kalahari trip.

Based on these alleged off-the-record admissions by plaintiff's counsel, the judge concluded:

> It is clear that the plaintiff is interfering with the defendant's efforts to have a meaningful relationship going forward. She apparently discharged her last attorney shortly after the plaintiff and her prior counsel consented to an increase in parenting time. Due to the plaintiff's actions, the matter is presently scheduled for a dismissal of the defendant's motion because the parties failed to submit the consent order.

22

The judge concluded his Statement of Reasons with the following admonition: "The plaintiff needs clearer direction and must understand that there will be consequences for continued interference. She is put on notice that sanctions will be imposed if she fails to abide by Court Orders."

Plaintiff filed her Notice of Appeal from the April 27, 2018 order that same day. Defendant filed a second OTSC before the same Family Part judge on May 1, 2018, seeking nearly the identical relief he sought in the first OTSC, namely: (1) immediate transfer of residential custody of the two teenage girls; (2) supervised communication when plaintiff contacts the girls; (3) an order for plaintiff to submit to psychiatric evaluation; (4) directing plaintiff to cooperate with a custody evaluation; (5) holding plaintiff in violation of litigant's rights on a variety of grounds; and (6) a variety of sanctions, including awarding defendant counsel fees.

On May 4, 2018, plaintiff filed her opposition to the OTSC. The parties and their counsel appeared before the judge that same day. Defendant's counsel argued that her client merely sought the enforcement of the relief already awarded by the court, specifically: (1) the agreement reached on April 3, 2018; (2) the court's sua sponte April 27, 2018 order; and (3) the relevant provisions of the MSA. In response, the judge summarized the case's procedural saga and

23

asked the attorneys whether the Family Part had jurisdiction to adjudicate defendant's second OTSC pursuant to Rule 2:9-1(a) and Rule 5:3-7.

At the judge's request, the attorneys stated for the record that on April 3, 2018, the parties reached an agreement to modify the parenting time schedule reflected in the MSA. However, plaintiff's new counsel specifically quoted a part of the April 3, 2018 transcript in which the judge ordered the parties "to have within 10 days one overnight [visit and] . . . to work out weekly visits and Dr. Hamway." The judge directed the parties to sign a draft order by the end of the day. The judge found the parties did not submit the signed order as directed. Consequently, the judge held "there is no April 3rd, 2010, order. And I am not finding the plaintiff in violation of any court order of April 3rd, 2010. (sic)."

Against this backdrop, the judge made the following findings:

> THE COURT: [T]here are two different documents that I find are the current order in this matter.
>
> PLAINTIFF'S COUNSEL: Your Honor.
>
> THE COURT: Yes.
>
> PLAINTIFF'S COUNSEL: So I believe from a technical perspective, the most recent order entered is the judgment of divorce, it is dated November 14th, 2017. And that's prior to the April 27th order. That document incorporated three preexisting documents, the MSA, the amendment to the MSA, and the June 2nd, 2017, consent order.

24

THE COURT: Right.

PLAINTIFF'S COUNSEL: But the most recent order is the judgment of divorce, incorporating the three prior documents.

THE COURT: Okay. Do you agree with that, [addressing defendant's counsel]?

DEFENDANT'S COUNSEL: I do, Your Honor.

Ultimately, the judge denied without prejudice defendant's OTSC dated May 2, 2018, and found the version of the MSA dated June 6, 2016 remained in full force and effect and is subject to enforcement pursuant to Rule 1:10-3 and Rule 5:3-7.

IV

In this appeal, plaintiff argues the Family Part's April 27, 2018 order must be vacated because: (1) the judge proceeded in this case in a manner that denied plaintiff the right to procedural due process; (2) the judge made material modifications to the carefully crafted parenting time arrangement the parties negotiated and agreed to in the MSA without making any findings that these changes were in the best interest of the children; and (3) the judge abused his discretionary authority by failing to afford the two teenaged girls most affected by these changes with the opportunity to have their points of view considered in the manner provided by Rule 5:8-6. We agree and reverse.

25

We start our analysis by addressing plaintiff's criticism of the manner the Family Part judge managed and ultimately disposed of this case. "'Trial judges are given wide discretion in exercising control over their courtrooms' and have 'the ultimate responsibility of conducting adjudicative proceedings in a manner that complies with required formality in the taking of evidence and the rendering of findings.'" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 366 (2017) (quoting Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 264 (App. Div. 2002)). Here, the record shows the judge interacted with both the attorneys and the parties they represented in an informal manner that "ultimately undermined the solemnity and decorum necessary for effective courtroom management." D.A. v. R.C., 438 N.J. Super. 431, 461 (App. Div. 2014).

This informality began with defendant's April 1, 2018 OTSC, and consistently tainted the proceedings. The judge permitted defendant to provide ex parte testimony predicated on the same allegations of impropriety defendant raised in his Motion to Enforce Litigant's Rights filed on March 27, 2018. The judge questioned defendant ex parte on the substance of his allegations against plaintiff without making a threshold finding that: (1) defendant's relief was necessary to prevent irreparable harm; (2) his legal rights underlying the allegations were settled; (3) defendant had a reasonable probability of ultimate success on the merits; and (4) the relative hardship to the parties in granting or

26

denying relief favored granting defendant's application. Crowe v. De Gioia, 90 N.J. 126, 132-34 (1982).

Despite this analytical void, the record shows the judge continued this line of inquiry with defendant until his court clerk informed him that plaintiff's counsel had contacted the court and requested to participate telephonically in this hearing. The judge's colloquy with counsel revealed the parties' tumultuous relationship with their children that included the parenting time arrangement the parties negotiated in the MSA and the matrimonial judge sanctioned and incorporated into the JOD. The record also shows that plaintiff's counsel repeatedly asked the judge for an opportunity to formally respond to defendant's allegations to provide the court with a balanced account of the events that led to this OTSC.

The judge rejected plaintiff's reasonable request and ordered the parties and their attorneys to appear before him at 8:30 a.m. the following day, April 3, 2018. The judge's recalcitrance in this respect served only to exacerbate an already chaotic situation. This unstructured approach lacked the decorum and solemnity necessary to conduct a valid adjudicative proceeding. The judge's impromptu decision to require the parties and their counsel to come up with a plan to compel the girls to spend time with their father, as provided under the MSA, proved to be equally ineffective. The tentative agreement the attorneys

27

outlined in a handwritten, multi-page document, which the parties signed that day, was never implemented.

In the course of the April 3, 2018 hearing, the judge emphasized that "no 14 year old and no 12 year old . . . are going to drive this bus." Judges are not omnipotent. Children, especially adolescents going through this family crisis, have a will of their own. The futility of the extra-judicial, ad hoc approach the judge employed here to compel these two teenage girls to spend time with their father exemplifies our limitations as jurists.

The judge's failure to respond or even acknowledge plaintiff's counsel's request that he interview the children and defendant's request to transfer the custody of the children to him constituted reversible error. Rule 5:8-6 provides, in relevant part:

> Where the court finds that the custody of children is a genuine and substantial issue . . . the court may on its own motion or at the request of a litigant conduct an in camera interview with the child(ren). In the absence of good cause, the decision to conduct an interview shall be made before trial. If the court elects not to conduct an interview, it shall place its reasons on the record.

As this court made clear in D.A., among the factors the Legislature required a court to consider when making an award of custody is "the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision[.]" 438 N.J. Super. at 458 (quoting N.J.S.A. 9:2-4(c))

28

(emphasis omitted). The judge did not comply with the requirements of <u>Rule</u> 5:8-6 by not responding directly to plaintiff's counsel's request for the court to interview the children. The judge also violated N.J.S.A. 9:2-4(c) by not considering the children's views at a time when both girls were "of sufficient age and capacity to reason so as to form an intelligent decision." The judge erred by failing to consider, as required by N.J.S.A. 9:2-4(c), the children's views at the time when both were "of sufficient age and capacity to reason so as to form an intelligent decision."

We are equally troubled by the breadth and scope of the April 27, 2018 order, which requires the parties to retain a parenting coordinator and a reunification therapist without any input from the attorneys representing the parents. We thus vacate the April 27, 2018 order and remand the matter to the Family Part for the court to conduct a plenary hearing in which he shall consider the relevant statutory and regulatory standards to determine whether a change in residential custody is in the best interest of the children. The court may expand the scope of the hearing to address any issues affecting the parenting time of a parent.

The judge shall apply the standard in <u>Rule</u> 5:8-6 to determine if interviewing these two teenaged girls is in their best interest.

29

> If the judge elects to interview [the children], (as the prevailing circumstances here strongly indicate he should), Rule 5:8-6 mandates the court to: (1) conduct an interview with the child in camera; (2) "afford counsel the opportunity to submit questions for the court's use during the interview"; (3) "place on the record its reasons for not asking any question thus submitted"; (4) create and preserve a stenographic or recorded audio record of each interview in its entirety; and (5) provide transcripts of the interview(s) to counsel and the parties upon request and payment for the cost.
>
> [D.A., 438 N.J. Super. at 459 (internal citation omitted).]

Finally, plaintiff has requested that we remand this case to another judge. Pursuant to Rule 1:12-1(g), a judge is disqualified from presiding of a case "when there is any . . . reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." Our Supreme Court has adopted the following standard to assess whether a judge's personal behavior creates an appearance of impropriety: "Would an individual who observes the judge's personal conduct have a reasonable basis to doubt the judge's integrity and impartiality?" In re Reddin, 221 N.J. 221, 223 (2015).

Here, in the course of these proceedings, the judge made a number of statements that touched upon plaintiff's credibility based only on unsubstantiated allegations made by defendant in his certifications. Under

30

these circumstances, we are satisfied that a person in plaintiff's position would have a reasonable basis to doubt the judge's impartiality. In reaching this conclusion, we do not in any way intent to impugn the judge's integrity or imply the judge violated any of the canons of judicial conduct. As we made clear in P.M. v. N.P.:

> Given this exalted place marriage as an institution occupies in our society, litigants embroiled in the legal dissolution of their union are often emotionally traumatized. They bring to these legal proceedings a deep sense of disappointment and an element of distrust that is rooted in the nature of the dissolution itself. Our Supreme Court has consistently recognized that judges who sit in the Family Part have a great sensitivity to these concerns and bring a high level of expertise to these emotionally fragile matters. See N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014) (citing Cesare v. Cesare, 154 N.J. 394, 412-13 (1998)). We thus expect our colleagues who sit in this legally difficult and emotionally demanding Part of the Chancery Division to be especially mindful of the challenges associated with this assignment.
>
> [441 N.J. Super. 127, 147 (App. Div. 2015).]

On remand, the Presiding Judge of the Family Part of this vicinage shall reassign this matter to another judge.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

31